UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JANE DOE #35; JANE DOE #36; JOHN DOE #64; JOHN DOE #115; JOHN DOE #117; and JOHN DOE #123,<br><br>  Plaintiffs,<br><br>    v.<br><br>RAÚL LABRADOR,[1] Attorney General of the State of Idaho; and COLONEL KEDRICK WILLS, Director of the Idaho State Police, in their official capacities,<br><br>  Defendants. | Case No. 1:16-cv-00429-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

On April 5, 2019, the Court dismissed Plaintiffs' Second Amended Complaint with prejudice. Dkt. 47. Plaintiffs successfully appealed, and the case is now before the Court on the Ninth Circuit's remand of some of Plaintiffs' claims. After the Ninth Circuit remanded, Plaintiffs ultimately filed a Fourth Amended Complaint.[2] Dkt. 73. Defendants filed another Motion to Dismiss (Dkt. 76) and the Court heard oral argument and took the matter under advisement (Dkt. 84).

---

[1] Raúl Labrador is substituted for former Idaho Attorney General Lawrence Wasden pursuant to Federal Rule of Civil Procedure 25(d).

[2] Plaintiffs filed a Third Amended Complaint on May 4, 2021, (Dkt. 67) but, before Defendants had answered or otherwise responded, filed a Fourth Amended Complaint on May 26, 2021 (Dkt. 73).

For the reasons set forth below, Defendants' Motion to Dismiss is DENIED.

## II. BACKGROUND

Plaintiffs are six men and women[3] who must register for life as sex offenders under Idaho's "Sexual Offender Registration Notification and Community Right-to-Know Act," Idaho Code section 18-8301 et seq. ("SORA"). Plaintiffs were each charged or convicted before 2006, when the Idaho Legislature began amending SORA to impose increasingly harsh restrictions.

Plaintiffs allege a series of amendments to SORA have heightened their registration and notification obligations, and have also imposed direct restrictions on their movement, housing, and employment. Because all amendments to SORA have been applied retroactively to all Idaho sex offender registrants, Plaintiffs argue such provisions violate the Constitution's Ex Post Facto Clause, U.S. Constitution, Art. I, § 10, cl. 1, and its prohibition against double jeopardy, U.S. Const., amend. 5. Plaintiffs also contend the cumulative effect of the amendments to SORA violates Idaho's Free Exercise of Religion Protected Act, Idaho Code section 73-402 ("FERPA").

### A. SORA

Idaho's original sex offender registration law came into effect on July 1, 1993. The law imposed only a duty for persons convicted of certain felony sex crimes to register with their local sheriff, and the registry was not available to the public. In 1998, the Idaho

---

[3] The first two operative Complaints included 134-Doe plaintiffs. Dkt. 4; Dkt. 36. Plaintiffs now seek to proceed with these six Plaintiffs as representatives of the universe of registrants—including the other 128-Doe plaintiffs—who would benefit from success on Plaintiffs' facial claims. Dkt. 73, at 2 n. 1.

Legislature repealed the 1993 law and passed SORA. I C § 18-8301 et seq. SORA created a central registry of offender information and made the registry publicly available. It also delineated seventeen registrable offenses and expanded the category of offenders required to register. *Id*., § 18-8304.

The 1998 version of SORA applied retroactively to any person convicted of a newly eligible offense after July 1, 1993. It also applied retroactively to any person who entered the state of Idaho after July 1, 1993, who had been convicted of any crime that was "substantially equivalent" to SORA's registrable offenses. The 1998 version of SORA required all registrants to undergo a "psychosexual evaluation" upon conviction. *Id*., § 18-8316. Registrants convicted of a subcategory of offenses, listed in Idaho Code § 18-8312, and found to pose such a risk based on their evaluation, were deemed "violent sexual predators." *Id*., § 18-8303(10). All registrants, except for violent sexual predators, were eligible to petition the district court for a show cause hearing to determine whether the person could be exempted from the registration requirements after a ten-year period. *Id*., § 18-8310(1). Violations of registry requirements could result in felony offenses punishable by up to five years of incarceration and a $5,000.00 fine. *Id*., § 18-8311(1). If a registrant was on some form of supervised release at the time of a registry violation, punishment could include revocation of release and reinstatement of the underlying prison sentence. *Id*.

The Legislature amended SORA again in 2001, 2002, 2004, 2005, 2006, 2008, 2009, 2011, 2012, 2013, 2016, 2018, 2019, and 2020. Each set of amendments was applied retroactively in the same manner as the 1998 version of SORA. The amendments expanded

SORA's framework, adding to the list of eligible offenses and heightening the obligations of registration. Plaintiffs identify certain amendments as particularly significant.

For instance, the 2001 amendments removed the right of registrants who had been convicted of an "aggravated offense" to petition for release from registration requirements after a ten-year period. By removing the right to petition for removal, the 2001 amendments created a lifetime registration requirement for people convicted of five "aggravated offenses."[4]

The 2004 amendments created a new felony crime for any registrant to accept employment "in any day care center, group day care facility or family day care home," or for any registrant to "be upon or to remain on the premises of a day care center, group day care facility or family day care home while children are present, other than to drop off or pick up the person's child or children[.]" *Id.*, § 18-8327(1). However, the 2004 amendments did add a provision allowing registrants to petition to be excluded from SORA's employment prohibitions. *Id.*, § 18-8328.[5]

In addition to adding sexual contact with a prisoner (I.C. § 18-6110) as a registrable offense, the 2005 amendments expanded out-of-state convictions which require registration in Idaho. Specifically, the 2005 amendments mandated registration for any

---

[4] In 2001, the crimes defined as "aggravated offenses" were: (1) lewd conduct, when the victim was less than 12 years of age (I.C. § 18-1508); (2) murder committed in the perpetration of rape (I.C. § 18-4003(d)); (3) rape (I.C. § 18-6101), but excluding statutory rape where the victim was at least 12 years of age or the defendant was 18 years of age or younger (§ 18-3101(1)); (4) male rape (I.C. § 18-6108); and (5) forcible penetration by use of a foreign object (I.C. § 18-6608).

[5] Idaho Code § 18-8328 provides a registrant may petition to be excluded from the prohibition against working in a school or day care if the registrant can show, with clear and convincing evidence, that he or she does not pose a threat and that at least ten years have passed since the registrant's last conviction.

person convicted of a crime, attempt, solicitation, or conspiracy to commit a crime in another state, territory, commonwealth, or other jurisdiction of the United States substantially equivalent to an enumerated registrable offense, as well as for any person required to register as a sex offender in another state or jurisdiction when s/he established residency in Idaho, regardless of whether the offense was substantially equivalent to an offense enumerated in SORA. *Id*., § 18-8304(1)(a)–(b).

The 2006 amendments added a provision that made it a misdemeanor offense for any registrant to be upon or remain on or within five hundred feet of school buildings and school grounds when children under the age of 18 are present. *Id*., § 18-8329(1)(a). This rule also applies to where registrants may reside, unless the registrant's residence was established prior to July 1, 2006. *Id*., § 18-8329(1)(d). Although the prohibition includes some exceptions, such as for when registrants are students at the school or transporting their own children to and from the school, *id*., § 18-8329(2)–(3), Plaintiffs contend the rule severely restricts their choice of employment and access to housing.

The 2009 amendments expanded the list of aggravated offenses and made several additional crimes registrable. *Id*., §§ 18-1506A, 18-1508, 18-4502, 18-4503, 18-8602(1), 18-8304.

SORA was again amended in 2011. As in 2009, new offenses were added to the list of crimes requiring registration. *Id*., §§ 18-5605, 18-5611, 18-6609, 18-7804. The 2011 amendments also expanded the amount of information required at registration, while decreasing the amount of time registrants had to comply. *Id*., § 18-8307. In addition, the 2011 amendments required registrants to provide advance notice of any travel lasting

longer than a week, and to provide in-person notice of their presence to law enforcement in the jurisdictions to which they travel. *Id*., § 18-8309. The 2011 amendments also altered the role of individualized review within SORA's framework. The Sex Offender Classification Board—the entity previously responsible for evaluating the risk of offenders and classifying "violent sexual offenders"—was renamed as the "Sex Offender Management Board." I.C. § 18-8312. The provisions charging the Board with evaluating the risk posed by offenders were struck, and the Board's authority was instead defined as the development, advancement, and oversight of sexual offender management policies and practices statewide. *Id*., § 18-8314(1). The provision requiring a psychosexual evaluation was made discretionary, and the term "violent sexual predator" was redefined to mean only those previously designated as such by the former Classification Board. *Id*., §§ 18-8303(17), 18-8316.

The 2011 amendments also restated SORA's registration period, making the default term for all registrants "for life." *Id*., § 18-8307(7). Eligibility to petition for removal after ten years was previously the default, with lifetime registration listed as the exception. After the 2011 amendments, the petition right is listed as the exception from the default of lifetime registration, *id*., and is available only for those registrants who are not recidivists, were not convicted of an aggravated offense, and were not previously deemed violent sexual predators. *Id*., § 18-8310(1) *amended by* 2023 Idaho Laws Ch. 183 (H.B. 117).

While the 2016, 2018, and 2019 amendments primarily tracked changes the Legislature made to underlying offenses, the 2020 Amendments added day cares to the exclusion zone previously only measured around schools and school zones. I.C. § 18-8329.

MEMORANDUM DECISION AND ORDER - 6

To summarize, when SORA was enacted in 1998, it required individualized risk evaluation of each registrant, with only those classified as violent sexual predators ineligible to petition for removal. SORA now characterizes registrants based on the offense of conviction—either aggravated or non-aggravated—without any individualized assessment.[6] The default registration term is for life, but with those who were not convicted of an aggravated offense, are not recidivist, and are not violent sexual predators eligible to petition for removal after ten years. While seventeen crimes were registrable under the 1998 version of the statute, twenty-six crimes are registrable today. Plaintiffs contend the modern version of SORA banishes them from large parts of the populated areas of Idaho. They highlight that SORA's scope has grown to encompass more crimes and more people for the default of a lifetime term, while also "ratcheting up the restrictions on registrants' lives and liberty through near-annual amendments." Dkt. 73, ¶ 146.

## B. Plaintiffs

Plaintiffs are a group of four men and two women required to register as sex offenders in Idaho. Each of the six representative Plaintiffs were charged or convicted before 2005, and none have ever been convicted of another registrable offense. At the time of their crimes, each of the six representative Plaintiffs would have been eligible to petition for removal from the registration requirement after ten years. The 2009 amendments foreclosed Plaintiffs' ability to petition for removal, instead retroactively subjecting them to lifetime registration. As a result, Plaintiffs must comply with SORA's heightened

---

[6] In 1998, five crimes were considered aggravated. Today nine crimes fall in the aggravated category. *Id.*, § 18-8303(1).

reporting obligations and its restrictions on housing, travel, and employment.

Plaintiffs allege the current version of SORA strictly limits their ability to direct the upbringing of their children, find housing and employment, travel, be free from harassment and stigma, and attend religious services on the grounds of any faith-based institution that is also operated as a school or daycare. Plaintiffs contend SORA subjects them to a lifetime of reporting, surveillance, supervision, and exclusion. Further, Plaintiffs maintain total compliance with the current version of SORA is impossible because: (1) some of SORA's restrictions and obligations are vague and confusing; (2) SORA imposes penalties for violating the law even if illness, injury, or practical differences make compliance impossible; and (3) Plaintiffs often cannot know if they are within five hundred feet of a school or daycare.

Because Plaintiffs' convictions occurred before many of the amendments to SORA, and in some cases even before SORA became law, the Court must consider whether the statute constitutes retroactive punishment forbidden by the Constitution. *United States v. Smith*, 538 U.S. 84, 92 (2003).

### C. Procedural History

This case has a lengthy procedural history, at times complicated by Plaintiffs' original counsel. For instance, on September 22, 2016, 104-Doe Plaintiffs filed their initial Complaint against approximately forty Idaho state defendants. Dkt. 1. Seven months passed without service of the Complaint. On April 26, 2017, 134-Doe Plaintiffs filed a 145-page Amended Complaint against more than thirty Defendants. Dkt.4. Another four

months passed without service of the Amended Complaint on all but one Defendant.[7]
Finally, on September 25, 2017, the remaining Defendants filed waivers of service. Dkt.
10.

On November 17, 2017, the original Defendants filed a Motion to Dismiss ("first
Motion to Dismiss"). Dkt. 15. After obtaining two extensions, Plaintiffs' counsel
responded to the first Motion to Dismiss on February 2, 2018. Dkt. 24. Following a hearing,
the Court granted the first Motion to Dismiss on May 17, 2018. Dkt. 32. While the Court
gave Plaintiffs leave to amend some of their as-applied challenges to SORA, it dismissed
all facial challenges without leave to amend. *Id*. at 38. The Court also held Plaintiffs could
not amend certain causes of action because even as-applied challenges to such claims
would fail. *Id*. at 40. The Court allowed Plaintiffs to amend the rest of their constitutional
claims to state appropriate as-applied challenges. *Id*. at 39.

After receiving an extension of time to comply, Plaintiffs filed a Second Amended
Complaint on August 30, 2018. Dkt. 36. In their Second Amended Complaint, Plaintiffs
provided allegations in support of as-applied claims on behalf of twelve of the 134-Doe
Plaintiffs. *See generally id*. Defendants filed a second Motion to Dismiss on October 18,
2018. Dkt. 40. The Court ultimately found that the Second Amended Complaint failed to
state a claim and dismissed the case with prejudice.[8] Dkt. 47. Plaintiffs appealed and, on

---

[7] Specifically, while former Idaho State Attorney General Lawrence Wasden was served on July 7, 2017,
it appears none of the other Defendants were served with the Amended Complaint on that date. Dkt. 9.

[8] The Court spent considerable time and effort parsing through Plaintiffs' First and Second Amended
Complaints. For instance, the First Amended Complaint did "not list particular causes of action as to
specific individuals, but merely stat[ed] that all plaintiffs suffer from a wide variety of constitutional
depravations SORA has created[.]" Dkt. 32, at 2. Although the Court asked Plaintiffs to provide more

December 9, 2020, the Ninth Circuit reversed in part, affirmed in part, and remanded the case to this Court. Dkt. 55.[9]

The Ninth Circuit found no error in the Court's analysis of Plaintiffs' vagueness, Free Association, Equal Protection, Contracts Clause, Takings, Separation of Powers, and state Police Power challenges, and affirmed dismissal of those claims. *Does v. Wasden*, 982 F.3d 784, 795 (9th Cir. 2020) ("*Wasden*"). The Ninth Circuit found the Court only erred in dismissing Plaintiffs' ex post facto and free exercise claims and, accordingly, in dismissing Plaintiffs' Eighth Amendment and double jeopardy claims on the same basis. *Id*. Plaintiffs bring ex post facto, double jeopardy, and free exercise claims in their Fourth Amended Complaint, and conceded during oral argument that they have abandoned their Eighth Amendment claim.

Following the remand order, the Court held an informal status conference with counsel for the parties on February 4, 2021. Dkt. 59. Pursuant to discussions during the conference, the Court ordered Plaintiffs to file their third amended complaint by March 5, 2021. Plaintiffs again obtained extensions to the deadline, and ultimately filed a Third Amended Complaint on May 4, 2021. Dkt. 67.[10]

---

details so the Court could discern whether their claims were viable, in their Second Amended Complaint, Plaintiffs merely "add[ed] facts with respect to [only] twelve . . . defendants," "fail[ed] to tie such facts to specific constitutional violations," and "fail[ed] to allege essential details which would allow the Court to evaluate whether any of the as-applied challenges [were] plausible." Dkt. 47, at 1. Prior to filing their Fourth Amended Complaint, Plaintiffs deployed "their own version of the spaghetti approach" by heaving "the entire contents of a pot against the wall in the hopes that something would stick." *Does v. Wasden*, 982 F.3d 784, 796 (9th Cir. 2020) (VanDyke, J., concurring in part and dissenting in part) (citation omitted).

[9] The Ninth Circuit issued its formal mandate on December 31, 2020. Dkt. 56.
[10] The Court does not typically "call out" an attorney's performance. However, the Court has provided an unusual number of extensions and courtesies in this case. It gave Counsel every opportunity to put forth the best case possible by painstakingly analyzing each argument and pointing out deficiencies. It also

Attorney Matthew Strugar subsequently appeared on behalf of Plaintiffs. The Court held a second status conference on May 21, 2021, during which the parties agreed to an extended briefing schedule for Defendants' intended motion to dismiss. Dkt. 72. On May 26, 2020, Mr. Strugar filed the instant Fourth Amended Complaint. Dkt. 73. As noted, the Fourth Amended Complaint identifies six Doe-plaintiffs as representatives of the universe of SORA registrants, including the other 128-Doe Plaintiffs identified in the previous complaints. The Fourth Amended Complaint names two defendants, Idaho's Attorney General and the Director of the Idaho State Police (hereinafter "Defendants"). As planned, Defendants filed a third Motion to Dismiss, Dkt. 76, and, after oral argument, the Court took the matter under advisement. Dkt. 84.

## III. LEGAL STANDARD

A motion to dismiss for failure to state a claim under Rule 12(b)(6) challenges the legal sufficiency of the claims stated in the complaint. *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011). "A Rule 12(b)(6) dismissal may be based on either a 'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008) (citation omitted).

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and

---

admonished counsel to ensure briefing and arguments were accurate. *See* Dkt. 32, at 10 n.7. Even after such efforts, Counsel's briefing before the Ninth Circuit was noted as being "particularly inartful" by the majority, and "woefully inadequate" by the concurrence/dissent. *Wasden*, 982 F. 3d at 792, 796. If an attorney is not well-versed in a particular subject area or has other obligations calling upon his or her time, he or she should make other arrangements for the client so that it does not take seven years to begin discovery or require the Court (in this case District and Appellate) to parse through pages of text to cobble together cognizant arguments for the party.

plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "This is not an onerous burden." *Johnson*, 534 F.3d at 1122. In considering a Rule 12(b)(6) motion, the Court must view the complaint in the light most favorable to the claimant and "accept[] all well-pleaded factual allegations as true, as well as any reasonable inference drawn from them." *Id.*

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("*Iqbal*") (cleaned up). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556. The plausibility standard is not akin to a "probability requirement," but does require more than a sheer possibility that a defendant acted unlawfully. *Id*. A complaint "does not need detailed factual allegations," but it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citations omitted).

## IV. ANALYSIS

### A. Application of the Ninth Circuit's Decision to the Motion to Dismiss

Before turning to the parties' arguments, the Court first addresses how it will evaluate the instant Motion to Dismiss given the Ninth Circuit's guidance with respect to the errors the Court made when dismissing Plaintiffs' facial and as-applied challenges in its prior decisions.

MEMORANDUM DECISION AND ORDER - 12

*1.  Facial versus as-applied challenges*

First, the Ninth Circuit found the Court erred in construing Plaintiffs' ex post facto claim as an "as-applied" challenge. *Wasden*, 982 F.3d at 791. Where, as here, a plaintiff contends a statute is unconstitutional, there are two types of challenges: "facial" or "as-applied." "A facial challenge is a challenge to an entire legislative enactment or provision." *Hoye v. City of Oakland*, 653 F.3d 835, 857 (9th Cir. 2011) (citing *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998)). As-applied challenges, on the other hand, do not look at the text, or face, of the statute, but rather argue that even if a law is valid on its face, it may nonetheless—as the name suggests—be unconstitutionally applied in a particular case.[11]

A facial challenge presents an extremely high bar because a plaintiff must show that the statute is unconstitutional in all possible applications. *Diaz v. Paterson*, 547 F.3d 88, 101 (2d Cir. 2008). Facial challenges are "disfavored" because they: (1) "raise the risk of premature interpretation of statutes on factually barebones records"; (2) run contrary "to the fundamental principle of judicial restraint"; and (3) "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450–51 (2008). As such, a "facial challenge must

---

[11] "Facial and as-applied challenges do not enjoy a neat demarcation, but conventional wisdom defines facial challenges as 'ones seeking to have a statute declared unconstitutional in all possible applications,' while as-applied challenges are 'treated as the residual, although ostensibly preferred and larger, category.'" *Standing--Facial Versus As Applied Challenges--City of Los Angeles v. Patel*, 129 HARV. L. REV. 241, 246 (2015) (quoting Richard H. Fallon, Jr., *Fact and Fiction About Facial Challenges*, 99 CAL. L. REV. 915, 923 (2011)).

fail where the statute has a plainly legitimate sweep." *Id.* at 449. In *United States v. Salerno*, the Supreme Court explained a "facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that *no set of circumstances exists* under which the Act would be valid." 481 U.S. 739, 745 (1987) ("*Salerno*") (emphasis added).

In their First Amended Complaint, Plaintiffs appeared to initially raise a facial challenge to SORA[12] under the Ex Post Facto Clause.[13] Pursuant to *Salerno*, the Court dismissed all of Plaintiffs' facial challenges to SORA with prejudice because SORA has a "plainly legitimate sweep" in that it is applicable to thousands of Idahoans who are required to register for a time, but then in due course are no longer required to register. Dkt. 32, at 9. The Court determined Plaintiffs instead made up the limited group of offenders who were convicted of "aggravated offenses," or who have been designated recidivists, and thus must register for life. The Court held it was only to the latter category of individuals to whom Plaintiffs' constitutional challenges could apply. Because Plaintiffs had not pleaded any specific as-applied challenges, the Court initially determined amendment was necessary for the Court to appropriately evaluate Plaintiffs' claims.

In their Second Amended Complaint, Plaintiffs brought as-applied challenges to SORA. Dkt. 36. Following Defendants' second Motion to Dismiss, the Court ultimately

---

[12] Plaintiffs did not specify whether they raised facial or as-applied challenges in either their First Amended Complaint, or in their response to the first Motion to Dismiss. Dkt. 32, at 9 n. 5.

[13] The Ex Post Facto Clause, Article I, Section 10 of the Constitution, bars the enactment of any law that "imposes a punishment for an act which was not punishable at the time it was committed, or imposes additional punishment to that then prescribed." *Russell v. Gregoire*, 124 F.3d 1079, 1083 (9th Cir. 1997) (citations omitted).

dismissed the Second Amended Complaint with prejudice, finding, under the "intent-effects"[14] test of *Smith v. Doe*, 538 U.S. 84, 92 (2003), SORA is civil in intent and not punitive in effect. *See generally* Dkt. 47.

The Ninth Circuit held the Court erred in construing Plaintiffs' ex post facto claim as an as-applied challenge because, in *Seling v. Young*, 531 U.S. 250, 262 (2001), the Supreme Court held that ex post facto claims based on the punitive effects of purportedly civil statutes cannot be construed as "as-applied" challenges. *Wasden*, 982 F.3d at 791. In so holding, the *Seling* Court reasoned that evaluating the "civil nature of an Act by reference to the effect that the Act has on a single individual" would be unworkable because such an analysis would "never conclusively resolve whether a particular scheme is punitive and would thereby prevent a final determination of the scheme's validity" under the Ex Post Facto Clause. 531 U.S. at 263.

Given the holding in *Seling*, the Ninth Circuit instructed this Court to evaluate SORA's punitive effect based on a variety of factors—such as the terms of the statute, the obligations it imposes, and the practical and foreseeable consequences of those obligations—in relation to the statute on its face. *Wasden*, 982 F.3d at 791. The Ninth Circuit did not acknowledge the Supreme Court's seemingly contrary holding in *Salerno*

---

[14] The "intent-effects" test requires a two-part inquiry. *Smith*, 538 U.S. at 92. In the first step, a court considers whether the legislature intended to "establish civil proceedings" or to impose punishment. *Id.* (citing *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997)). If the legislature intended to impose punishment, the inquiry ends, and the statutory scheme is deemed punitive. *Id.* "If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, [the Court] must further examine whether the statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it civil." *Id.* (cleaned up). As further addressed below, *Smith* outlined five factors for courts to consider when determining whether a statute violates the Ex Post Facto Clause because its effects are punitive.

and did not address how a court can follow both *Salerno* and *Seling* when considering the
constitutionality of SORA.[15]

The Ninth Circuit's holding appeared to leave this Court in somewhat of a Catch-
22, where Plaintiffs cannot bring as-applied challenge under *Seling*, but also cannot
succeed with a facial challenge under *Salerno*. Neither side addressed this issue in either
their briefing on the instant motion, or in their briefing on Defendants' first two motions to
dismiss.[16] However, in *McGuire v. Marshall*, 50 F.4th 986, 1004 (2022) (11th Cir. 2022),
the Eleventh Circuit recently explained that, under *Seling*, ex post facto claims do not fit
into the frameworks typically used to review either facial, or as-applied, challenges.
Instead, if a court determines the legislature intended to create a civil scheme, the court
must then evaluate the factors outlined in *Smith* to determine whether the effects of SORA
are punitive as they are "generally felt by those who [are] subject to them." *McGuire*, 50
F.4th at 1004; *see also Smith*, 538 U.S. at 100 (evaluating whether the challenged law
imposed an affirmative disability or restraint by looking for evidence that the statutory
provisions "led to *substantial. . . disadvantages for former sex offenders* that would not
have otherwise occurred") (emphasis added).

In short, under *Seling*, a plaintiff cannot allege an ex post facto claim by
demonstrating the law's purportedly punitive effects only as to him. *McGuire*, 50 F.4th at

---

[15] The Ninth Circuit raised *Seling* sua sponte, as the parties did not suggest that ex post facto claims based
on the purportedly punitive effect of civil statutes cannot be construed as "as-applied challenges" either
before this Court, or on appeal. *Wasden*, 982 F.3d at 796 (VanDyke, J. concurring in part and dissenting in
part).

[16] Upon the Court's questioning, the parties did address the apparent conflict between *Salerno* and *Seling*
during oral argument on the instant Motion to Dismiss.

1005. "At the same time, a plaintiff need not satisfy the standard for a facial . . . challenge, which would require a showing that the law could never be applied retroactively in a constitutional manner." *Id*. Thus, for purposes of Plaintiffs' "facial" ex post facto claim, the Court will consider whether the effects of SORA are punitive as they are generally felt by SORA registrants. *Id*.

   2.  *"Clearest Proof" Standard*

Second, the Ninth Circuit held the Court erred in applying the "clearest proof" standard at the motion to dismiss stage. *Wasden*, 982 F.3d at 791. When a statute is expressly civil in intent, the Supreme Court has explained that only the "clearest proof" is sufficient to override the legislature's intent and render the putatively civil regulation a criminal penalty. *Smith*, 538 U.S. at 92 ("Because we ordinarily defer to the legislature's stated intent, only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty") (cleaned up). The Ninth Circuit held the Court erred in applying the "clearest proof" standard in granting Defendants' Motion to Dismiss, because at that stage of the proceedings, Plaintiffs only had to plausibly allege that SORA, on its face, is punitive in effect.[17] *Wasden*, 982 F.3d at 791.

As the dissent in *Wasden* highlighted, the "clearest proof" standard is "best understood as referring to a *presumption* that makes it harder for plaintiffs to win their

---

[17] While this Court referenced the "clearest proof" standard in passing when discussing Plaintiffs' inability to distinguish harms they have suffered from those considered in previous ex post facto challenges, it was only this inability to raise new and distinguishable harms from previous ex post facto challenges already considered and rejected by federal and state courts—and not the Does' inability to provide the "clearest proof" at the pleading stage—that this Court found was fatal to Plaintiffs' claims. Dkt. 47, at 19–20.

challenge. As such, the 'clearest proof' standard is relevant at the motion to dismiss stage." *Id.* at 798 (emphasis in original). Many courts have so held. *Waldman v. Conway*, 871 F.3d 1283, 1294 (11th Cir. 2017) (per curiam) ("Here, taken as true, none of the allegations in Waldman's complaint would provide the 'clearest proof' necessary to override the presumption that Alabama's stated civil intent to protect children is actually punitive"); *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 470–71 (7th Cir. 2012) ("To prevail in such a facial challenge, a plaintiff must cross a high bar . . . . The district court granted the state's motion to dismiss, finding the Center could not meet these standards. We affirm."); *Does #1–7 v. Abbott*, 345 F. Supp. 3d 763, 777 (N.D. Tex. 2018) (dismissing ex post facto and other constitutional claims given the *Smith* factors and "absent the 'clearest proof'" that the effects of Texas statute were punitive), *aff'd*, 945 F.3d 307, 311 (5th Cir. 2019) (per curiam) (holding constitutional claims did not "cross the minimum pleading threshold because [the Texas statute] is nonpunitive"); *Anderson v. Holder*, 647 F.3d 1165, 1173 (D.C. Cir. 2011) (affirming district's court's grant of motion to dismiss, explaining "Anderson and his amicus have failed to show by the clearest proof that the effects of the law negate the Council's intention to establish a civil regulatory scheme") (cleaned up); *Windwalker v. Bentley*, 925 F. Supp. 2d 1265, 1270 (N.D. Ala. 2013) (dismissing, for, among other things, failing to satisfy the clearest proof standard), *aff'd sub nom.*, *Windwalker v. Governor of Ala.*, 579 Fed. App'x 769 (11th Cir. 2014).

Nevertheless, given the Ninth Circuit's holding in *Wasden*, the Court must, in evaluating the instant Motion to Dismiss, consider only whether Plaintiffs have plausibly alleged that SORA, on its face, is punitive in effect. *Wasden*, 982 F.3d at 791. If Plaintiffs

have done so and survive Defendants' Motion to Dismiss, they will nonetheless face a "heavy burden when seeking to override a legislative expression of intent that a challenged provision is civil," and "only the clearest proof will suffice" to meet that burden on summary judgment or at trial. *McGuire*, 50 F.4th at 1005 (quoting *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997)).

### 3. Supreme Court and Ninth Circuit Precedent

Third, the Ninth Circuit held the Court erred in finding Plaintiffs' claims were precluded because the Court was not bound by precedent to find SORA is non-punitive in effect. *Wasden*, 982 F.2d at 792. Specifically, the Ninth Circuit noted the cases this Court relied upon in finding Plaintiffs' claims to be foreclosed by precedent, including *Smith*, 538 U.S. at 92; *Litmon v. Harris*, 768 F.3d 1237 (9th Cir. 2014); *United States v. Elk Shoulder*, 738 F.3d 948 (9th Cir. 2013); *United States v. Elkins*, 683 F.3d 1039 (9th Cir. 2012); and *ACLU v. Cortez Masto*, 670 F.3d 1046 (9th Cir. 2012) ("*Masto*"), considered retroactively applied registration and notification provisions, but did not address retroactively applied residency, travel, or employment restrictions—each of which are now imposed by SORA.

Precedent illustrates the registration and notification provisions of SORA are constitutional. *Litmon*, 768 F.3d at 1243 (finding lifetime requirement for sexual offenders to register in person every 90 days did not violate the Ex Post Facto Clause); *Elk Shoulder*, 738 F.3d at 954 (rejecting claim that federal sex offender registration requirements violate the Ex Post Facto Clause); *Elkins*, 683 F.3d at 1045 ("We join our sister circuits in holding that requiring a person to register under [the federal sexual offender registration act] based

on a conviction entered prior to [the act's] enactment does not violate the Ex Post Facto Clause"); *Masto*, 670 F.3d at 1056–57 (upholding law requiring registrants to appear in person to update registration information "not less frequently than every 90 days" and requiring law enforcement to actively disseminate notice of registration status). However, on remand, the Court must consider SORA's registration and notification provisions in conjunction with the residency, travel, and employment restrictions it also imposes. While the aforementioned cases may provide guidance, such cases do not necessarily foreclose Plaintiffs' constitutional claims. *Wasden*, 982 F.3d at 792.

Fourth, because the ex post facto analysis that the Ninth Circuit found to be in error was incorporated as the sole basis for dismissing Plaintiffs' double jeopardy claim, the Ninth Circuit also remanded Plaintiffs' double jeopardy claim. *Id*. at 788.

Finally, although, in their Amended Complaint, the Does waived their FERPA claim by failing to mention the statute—or any other state or federal law when alleging SORA substantially burdened their religion—the Ninth Circuit held the Does' FERPA claim passed muster because "it track[ed] with the language of the statute," and so the Court was accordingly obliged to "construe the pleadings in the light most favorable to plaintiffs." *Id*. at 794.

Ultimately, the Ninth Circuit remanded so this Court can "consider the effects of SORA's regulatory scheme, as amended and in its entirety, in determining whether it runs afoul of the Constitution." *Wasden*, 982 F.3d at 792; *see also id*. at 800 (VanDyke, J., concurring in part and dissenting in part) ("I narrowly concur in remanding to the district court to determine whether SORA is punitive in effect and therefore violates the Ex Post

Facto Clause, without the mistaken belief that it is foreclosed by binding precedent.").

   *4. Scope of Remand*

   The parties offer widely disparate interpretations of the Ninth Circuit's holding in *Wasden*. Defendants suggest "[w]hen the Ninth Circuit considered Plaintiffs' prior complaint, it did not decide whether Plaintiffs stated a claim under the Ex Post Facto Clause. The Ninth Circuit instead disagreed with this Court's prior reasoning, which was inhibited by Plaintiffs' 'woefully inadequate briefing.'" Dkt. 76-1, at 5 (quoting *Wasden*, 982 F.3d at 795–96 (VanDyke, J., concurring in part and dissenting in part). By contrast, Plaintiffs contend "the Ninth Circuit ruled Plaintiffs' claims must proceed." Dkt. 77, at 2. Except with respect to Plaintiffs' FERPA claim, the Court agrees with Defendants' interpretation of the Ninth Circuit's decision.

   The Ninth Circuit outlined what this Court must do on remand. Specifically, the Ninth Circuit explained "accepting the allegations as true, the district court must consider only whether [Plaintiffs] alleged that SORA is punitive in effect." *Wasden*, 982 F.3d at 791 (citing *Iqbal*, 556 U.S. at 678). In citing the well-known *Iqbal* standard for evaluating a motion pursuant to Federal Rule of Civil Procedure 12(b)(6), the Ninth Circuit seemed to both signal that it did *not* hold Plaintiffs' ex post facto and double jeopardy claims "must proceed," and that this Court should anticipate a third motion to dismiss. Dkt. 77, at 2. Only when assessing a motion to dismiss would the Court need to accept Plaintiffs' allegations as true. On summary judgment or at trial, "only the 'clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Smith*, 538 U.S. at 92 (citations omitted); *see also Creekmore v. Att'y Gen. of*

*Texas*, 341 F. Supp. 2d 648, 662 (E.D. Tex. 2004) (granting summary judgment in favor of defendant where plaintiff did not "present the clearest evidence" that effects of registration scheme were punitive); *Does #1-5 v. Snyder*, 834 F.3d 696, 705–705 (6th Cir. 2016) ("*Snyder*") (finding plaintiffs showed by the "clearest proof" during bench trial that Michigan's sexual offender registration statute imposed punishment).

Further, in reversing the Court's dismissal order, the Ninth Circuit did not analyze the *Smith* factors, or apply the standard for a facial challenge, both of which are necessary to determine whether Plaintiffs have stated an ex post facto claim. *See generally*, *Wasden*, 982 F.3d 784. Because the Ninth Circuit did not hold that Plaintiffs plausibly alleged the effects of SORA are so punitive in purpose or effect as to negate the State's intention to deem it civil, the Court rejects Plaintiffs' claim that the Ninth Circuit held their ex post facto and double jeopardy claims "must proceed." Dkt. 77, at 2; *Smith*, 538 U.S. at 92. Instead, the Ninth Circuit directed this Court to accept Plaintiffs' allegations as true and consider only whether Plaintiffs have plausibly alleged that SORA is punitive in effect. *Wasden*, 982 F.3d at 791.

The same cannot be said of Plaintiffs' FERPA claim, as the Ninth Circuit specifically held:

> To survive a motion to dismiss on their FERPA claim, Appellants must have alleged facts showing that the challenged policy substantially burdens the exercise of their religious beliefs. Appellants *have done so here* by alleging in their Second Amended Complaint that SORA restricts them from

attending their houses of worship, thereby inhibiting an important and sincerely motivated religious practice.[18]

*Wasden*, 982 F.3d at 794 (emphasis added) (citations omitted). The Fourth Amended Complaint similarly alleges that SORA restricts Plaintiffs from attending their houses of worship, thereby inhibiting their important and sincerely motivated religious practices. Dkt. 73, ¶¶ 179–182, 184–185[19], 224–226. As such, the Court finds Plaintiffs' FERPA claim must proceed pursuant to the Ninth Circuit's express language.

Despite the Ninth Circuit's explicit holding, Defendants suggest Plaintiffs' general allegations regarding FERPA are contradicted by allegations made by certain Plaintiffs regarding specifically how SORA inhibits their religious beliefs. Dkt. 76-1, at 19. For instance, Doe #115 alleges he wants "to be more involved with his church and his children's role in the church, but he cannot be as active as he would like [to] be, including being a youth coach, because he is a sex offender." Dkt. 73, ¶ 183. Defendants argue Doe #115's desire to be "more involved" "reveals that he already has some involvement—meaning he can attend his house of worship." Dkt. 76-1, at 19. That Doe #115 has some involvement with his church does not mean he can attend services at his church. For instance, Doe #115 may be involved through his relationship with church leaders or church groups, but still be unable to attend services. Defendants' contention fails to accept Doe

---

[18] Notably, when considering Plaintiffs ex post facto and double jeopardy claims, the Ninth Circuit did not include similar language concluding that Plaintiffs had successfully stated such claims. *See generally Wasden*, 982 F.3d 784.

[19] In paragraph 183 of the Fourth Amended Complaint, Plaintiffs include allegations regarding Doe #1's inability, as a registrant, to teach classes at his church and help at his church's camp. Dkt. 73. Because Doe #1 is no longer a plaintiff, his experiences are irrelevant to Plaintiffs' as-applied FERPA claim.

#115's allegations as true. *Johnson*, 534 F.3d at 1122.

Defendants also contend the allegation that "Doe #117 is restricted from attending religious services . . . to avoid the possibility of noncompliance with SORA" does not mean that Doe #117 is restricted from attending *his* church or that he is prohibited from a church he wants to attend. Dkt. 76-1, at 19 (citing Dkt. 73, ¶ 185). As with their argument regarding Doe #115, Defendants' argument with respect to Doe #117 fails to accept his allegations as true and does not construe the facts in the light most favorable to Doe #117, as the Court must when evaluating the third Motion to Dismiss.

Finally, Defendants maintain the claims by Does #35, #36, #64, and #124 that they cannot attend a church if it is within five hundred feet of a school or daycare misstates the law because the relevant regulation prohibits only "knowingly loiter[ing] on a public way" within five hundred feet of a school or daycare. Dkt. 76-1, at 19 (quoting Idaho Code § 18-8329(1)(b)). Defendants maintain "[a]ttending a religious service is not knowingly loitering, and a house of worship is not a public way." *Id*. at 20. Defendants do not cite any authority to suggest Idaho Code § 18-8329(1)(b) does not preclude registrants from attending religious services within five hundred feet of a school or daycare. Although they may present evidence that the statute is not interpreted—by police or others—to preclude attendance at religious services within five hundred feet of a school or daycare on summary judgment or at trial, the Court cannot assess evidence at this stage of the proceedings and must instead accept Plaintiffs' contention that they cannot attend religious services within five hundred feet of a school or daycare as true.

In sum, Plaintiffs state as-applied claims under FERPA.

*5.   Successive Motion to Dismiss*

Before turning to the merits of Plaintiffs' ex post facto and double jeopardy claims, the Court next addresses Plaintiffs' argument that Defendants' third motion to dismiss is procedurally barred by Federal Rule of Civil Procedure 12(g)(2). Dkt. 77, at 6–8.

Rule 12(g)(2) provides, in relevant part, "a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." However, an "amended complaint supersedes the original, the latter being treated thereafter as nonexistent." *Lacey v. Maricopa Cty.*, 693 F.3d 896, 928 (9th Cir. 2012) (en banc). As such, a defendant may file a successive motion to dismiss an amended complaint.[20] *See, e.g., In re Sony Grand Wega KDF-EA10/A20 Series Rear Projection HDTV Television Litig.*, 758 F. Supp. 2d 1077, 1098 (S.D. Cal. 2010) ("When Plaintiffs filed [an Amended Complaint] it superseded their previous complaint, and [Defendant] was therefore free to move again for dismissal")[21]; *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 903 F. Supp. 2d 880, 893 (C.D. Cal. 2012) (explaining district courts within the Ninth Circuit have "permitted defendants moving to dismiss an amended complaint to make arguments previously made and to raise new arguments that were previously available"); *Diehl v. Starbucks Corp.*, 2014 WL 12540524, at *4 (S.D. Cal. June 17, 2014) (same); *Chao v. Aurora Loan Services*,

---

[20] Moreover, as outlined above, the Ninth Circuit appeared to anticipate a successive motion to dismiss by directing this Court to, on remand, accept Plaintiffs' allegations as true and consider only whether Plaintiffs plausibly alleged that SORA is punitive in effect. *Wasden*, 982 F.3d at 791.

[21] Because an amended complaint supersedes the original, the Court's policy "to only accept one (1) motion to dismiss" typically does not apply when an amended complaint is filed. Dkt. 77, at 6 (citing Dkt. 75, at 1 n. 1).

2013 WL 5487420, at *4 (N.D. Cal. Sept. 30, 2013) ("Although Plaintiffs' frustration with [Defendant's] incessant motion practice is understandable . . . Defendant is entitled to bring another motion to dismiss in response to a newly-filed pleading"); *Stamas v. Cty. of Madera*, 2019 WL 289310, at *4 (E.D. Cal. Jan. 15, 2010) ("[A]n amended pleading is a new round of pleadings . . . and is subject to the same challenges as the original (i.e., motion to dismiss, to strike, for more definite statement")); *Migliaccio v. Midland Nat. Life Ins. Co.*, 2007 WL 316873, at *3 (C.D. Cal. Jan. 30, 2007) (rejecting plaintiffs' argument that Rule 12(g)(2) prohibited defendants from filing a successive motion to dismiss after plaintiffs amended their complaint).

Even if the Court held that Rule 12(g)(2) applies to amended pleadings, a court may exercise its discretion to consider a defense or objection that Rule 12(g)(2) would otherwise bar if such consideration would further the policy that the Federal Rules be "constructed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." *In re Apple iPhone Antitrust Litig.*, 846 F.3d 313, 318 (9th Cir. 2017) (citing Fed. R. Civ. P. 1). As the Court explained during oral argument, applying Rule 12(g)(2) under the current circumstances would allow a plaintiff to effectively circumvent Rule 12(b)(6) by filing an inadequate complaint, litigating a motion to dismiss and obtaining a dismissal without prejudice, and then filing an amended complaint that could no longer be challenged with a motion to dismiss. Such practice would not further the just resolution of a proceeding.

Further, as Defendants highlight, the Court held two status conferences with the parties following the remand order. Dkt. 58; Dkt. 70. During both conferences, Plaintiffs

informed the Court and Defendants that they would file an amended complaint, Defendants stated they intended to file a successive motion to dismiss, and Plaintiffs did not object or otherwise raise their Rule 12(g)(2) argument. In fact, Plaintiffs expressly agreed to an extended briefing schedule for the instant Motion to Dismiss. Dkt. 72. Denying the Motion to Dismiss on procedural grounds after Plaintiffs implicitly agreed that a successive motion could be filed would be unjust. Allowing Plaintiffs to now avoid Defendants' Motion to Dismiss under Rule 12(g)(2) would also greatly increase the expense and delay of this proceeding given Plaintiffs' failure to raise their procedural argument *before* the Motion was fully briefed and argued—despite having two conferences with the Court during which they could have done so.

In short, the Court rejects Plaintiffs' argument that the instant Motion to Dismiss is barred under Rule 12(g)(2).

### B. The *Smith* intent-effects test

Having outlined the appropriate standard for assessing Plaintiffs' constitutional claims at this stage of the proceedings, the relevant provisions of SORA it must assess, and the claims appropriately before it given the Ninth Circuit's decision, the Court turns next to Plaintiffs' ability to state an ex post facto claim.

The Ex Post Facto Clause prohibits retroactive punishment for acts which could not be punished at the time they were committed. *Stogner v. California*, 539 U.S. 607, 610 (2003). To fall within the ex post facto prohibition, "the law must be retrospective, that is, it must apply to events occurring before its enactment; and second, it must disadvantage the offender affected by it." *Neal v. Shimoda*, 131 F.3d 818, 825 (9th Cir. 1997) (cleaned

up). Here there is no dispute that SORA is retrospective; its many amendments apply to Plaintiffs even though they were sentenced before most of these restrictions were established. For instance, when they were sentenced in, or moved to, Idaho, all Plaintiffs would later have been eligible for release from the registration requirement under the previous version of SORA. Dkt. 73, ¶¶ 20, 28, 46, 57, 67, 78. The 2009 Amendments instead subject Plaintiffs to lifetime registration and foreclose any opportunity for them to be removed from the registry. *Id.*, ¶¶ 22, 32, 47, 59, 69, 81.

With respect to disadvantage, the Supreme Court has explained the Ex Post Facto Clause "is aimed at laws that 'retroactively alter the definition of crimes or increase the punishment for criminal acts.'" *California Dep't of Corr. v. Morales*, 514 U.S. 499, 504 (1995) (quoting *Collins v. Youngblood*, 497 U.S. 37, 43 (1990)). "This can be satisfied by showing that 'the new scheme, taken as a whole, is disadvantageous.'" *Neal*, 131 F.3d at 826 (quoting *Nulph v. Faatz*, 27 F.3d 451, 455 (9th Cir. 1994)). Plaintiffs allege they are disadvantaged by: (1) geographic exclusion zones which limit where they may reside, work, or attend religious services; (2) extensive reporting requirements which require them to "immediately" notify law enforcement for a wide variety of activities, including travel, or risk felony prosecution; (3) employment restrictions which bar them from accepting employment at any day care center, group day care facility, or family day care home; and (4) the inability to attend their children's educational or extracurricular activities. *See generally*, Dkt. 73. As such, Plaintiffs plausibly allege they are disadvantaged by SORA and its many amendments. Notably, Defendants do not suggest otherwise.

As noted *supra*, note 14, to determine whether a retroactive law violates the Ex Post

Facto Clause, the Court must first "ascertain whether the legislature meant the statute to establish 'civil proceedings.'" *Smith*, 538 U.S. at 92 (citing *Kansas*, 521 U.S. at 361). "If the intention of the legislature was to impose punishment, that ends the inquiry," and the law violates the Ex Post Facto Clause. *Smith*, 538 U.S. at 92. If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive," the Court must examine "whether the statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it civil." *Id*. (cleaned up).

      *1.  Intent of SORA*

      It appears the Ninth Circuit affirmed this Court's prior conclusion that the intent of SORA is civil and not punitive. Dkt. 47, at 12–13. Specifically, the Ninth Circuit seems to have agreed with this Court's determination that Idaho did not intend to impose punishment in enacting SORA by twice stating that, on remand, this Court must consider whether SORA is *"punitive in effect*." *Wasden*, 538 U.S. at 791–792 (emphasis added). If the Ninth Circuit disagreed with this Court's finding that Idaho did not intend to impose punishment in enacting, and amending, SORA, there would be no need for the Court to consider whether the effect of SORA is punitive. Instead, if the intent of the law was punitive, retroactive enforcement of SORA would violate the Ex Post Facto Clause. *Smith*, 538 U.S. at 92. However, even if the Ninth Circuit did not consider this Court's conclusion with respect to Idaho's civil intent in passing, and amending, SORA, the Court again finds the intent of the statute and its many amendments is to protect the public, and not to punish sex offenders.

      "Whether a statutory scheme is civil or criminal 'is first of all a question of statutory

construction.'" *Smith*, 538 U.S. at 92 (quoting *Kansas*, 521 U.S. at 361). A statute's text and structure are considered in determining the legislative objective. *Id*. Here, the Idaho legislature delineated the civil intent of SORA in the statutory text itself. Specifically, Idaho Code § 18-8302 provides:

> The legislature finds that sexual offenders present a danger and that efforts of law enforcement agencies to protect their communities, conduct investigations and quickly apprehend offenders who commit sexual offenses are impaired by the lack of current information available about individuals who have been convicted of sexual offenses who live within their jurisdiction. The legislature further finds that providing public access to certain information about convicted sexual offenders assists parents in the protection of their children. Such access further provides a means for organizations that work with youth or other vulnerable populations to prevent sexual offenders from threatening those served by the organizations. Finally, public access assists the community in being observant of convicted sexual offenders in order to prevent them from recommitting sexual crimes. Therefore, this state's policy is to assist efforts of local law enforcement agencies to protect communities by requiring sexual offenders to register with local law enforcement agencies and to make certain information about sexual offenders available to the public as provided in this chapter.

Thus, the Idaho legislature expressly found that "sexual offenders present a danger," that law enforcement agencies are hampered in their ability to protect communities from sex offenders in the absence of current information about offenders, and that providing public access to certain information about sex offenders will assist law enforcement, parents, communities, and organizations that work with youth and other vulnerable populations to protect children. I.C. § 18-8302. As the Supreme Court observed in *Smith*, "an imposition of restrictive measures on sex offenders adjudged to be dangerous is a legitimate nonpunitive governmental objective and has been historically so regarded." 538 U.S. at 93 (cleaned up). Because nothing on the face of SORA "suggests that the legislature

sought to create anything other than a civil . . . scheme designed to protect the public from harm," and the Legislature instead specifically identified only an intent to protect the public, the Court finds the intent of SORA is regulatory and not punitive. *Id*.

Moreover, Idaho courts have continued to recognize the civil intent of SORA even after its many amendments. Shortly after the Ninth Circuit remanded this case, the Idaho Supreme Court held SORA: (1) "provides an essential regulatory purpose that assists law enforcement and parents in protecting children and communities"; (2) "seeks to aid law enforcement in the protection of their communities by requiring sex offenders to register with local law enforcement agencies"; and (3) "is not an additional punishment." *State v. Glodowski*, 463 P.3d 405, 409 (Idaho 2020) (citations omitted).

Prior to *Glodowski*, the Idaho Supreme Court consistently held the intent of SORA is not punitive. *Ray v. State*, 982 P.2d 931, 935 (Idaho 1999) ("The purpose of Idaho's registration statute is not punitive, but remedial"), *abrogated on other grounds by Icanovic v. State*, 363 P.3d 365, 367 (Idaho 2015); *State v. Joslin*, 175 P.3d 764, 775 (Idaho 2007) (considering SORA before the 2009 amendments and concluding the purpose of SORA is not punitive but instead to provide "an essential regulatory purpose that assists law enforcement and parents in protecting children and communities."); *State v. Johnson*, 266 P.3d 1145, 1150 (Idaho 2011) (finding SORA as a whole to be regulatory in purpose, even after the 2009 amendments).

The Idaho Court of Appeals has also repeatedly so held. In *State v. Gragg*, 137 P.3d 461, 463 (Idaho Ct. App. 2005), the Idaho Court of Appeals evaluated SORA under *Smith* and found no evidence to suggest the Legislature intended to create a civil scheme. In 2014,

the Idaho Court of Appeals determined the retroactive application of the 2001 and 2009 amendments to SORA—which define more offenses as aggravated offenses and preclude those convicted of aggravated offenses from obtaining an exemption to the registration requirement—and found no reason to infer that the Idaho Legislature intended such amendments to be anything other than civil and non-punitive. *Groves v. State*, 328 P.3d 532, 536 (Idaho Ct. App. 2014) (citing *State v. Johnson*, 266 P.3d at 1148). In 2017, after additional amendments to SORA in 2011, 2012, and 2013, the Idaho Court of Appeals reiterated that the legislative intent of SORA is to "create a civil, regulatory scheme." *Knox v. State*, 404 P.3d 1280, 1284 (Idaho Ct. App. 2017) (citing *Groves*, 328 P.3d at 535). And, in *State v. Kinney*, 417 P.3d 989, 996 (Idaho Ct. App. 2018), the Idaho Court of Appeals reviewed the many amendments to SORA and held such changes did not "tip the scales" and change the purpose of SORA from "nonpunitive to punitive."

Finally, although they conclusively state the "intent of the current version of SORA is punitive" in their Fourth Amended Complaint, Plaintiffs did not provide *any* additional allegations to support this conclusion. Dkt. 73, ¶ 204. Nor did Plaintiffs address the purportedly punitive intent of SORA in their opposition to the instant Motion to Dismiss. *See generally*, Dkt. 77. During oral argument, Plaintiff's counsel conceded that Plaintiffs do not rely on punitive intent, but rather contend that the effects of SORA and its many amendments are punitive regardless of legislative intent.

In sum, the Court again finds SORA was enacted and amended with a civil, and nonpunitive, legislative intent.

2. *Effects of SORA*

Since the intent of SORA is civil, the Court must next consider whether Plaintiffs have plausibly alleged that SORA is nevertheless so punitive in effect as to negate the legislature's intent to deem it civil. *Smith*, 538 U.S. at 92. The Supreme Court established five "guideposts"[22] that are relevant when considering whether SORA's actual effects are punitive. These include whether the law: (1) inflicts sanctions which have historically been regarded as punishment; (2) imposes an affirmative disability or restraint; (3) promotes the traditional aims of punishment; (4) has a rational connection to a nonpunitive purpose; and (5) is excessive with respect to this purpose. *Id*. at 97 (citing *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963)).

a.  Punishment

Plaintiffs contend SORA's reporting, surveillance, and supervision requirements "are much like, but more restrictive and onerous than, the reporting, surveillance, and supervision that Plaintiffs experienced while serving their sentences on probation or parole." Dkt. 73, ¶ 161. For instance, Plaintiffs highlight they are required to report annually in person and must provide a photograph,[23] fingerprints, and palm prints. *Id*., ¶ 156. In addition to yearly mandatory reporting, Plaintiffs must report in person, within two working days, whenever certain information changes, including a change in name, residence, employment, or student status. *Id*., ¶ 157. Immediate reporting is required for

---

[22] Because such factors "are designed to apply in various constitutional contexts," they are "neither exhaustive nor dispositive." *Id*. at 97 (citations omitted).

[23] If a Plaintiff's appearance changes, s/he must update the photograph. *Id*., ¶ 156.

any changes in vehicle information or internet usernames, as well as for any lodging or travel that is seven days or longer. *Id.*, ¶¶ 158–159. There are no good cause exceptions to the notification and reporting requirements, and regardless of illness, injury, transportation issues, or other emergencies, Plaintiffs must report within two days or face criminal charges. *Id.*, ¶ 160. The current version of SORA imposes penalties of up to ten years imprisonment for violating the law. *Id.*, ¶ 198.

Given the burdensome extent of the reporting requirements and the criminal sanctions associated with a failure to comply, Plaintiffs plausibly allege their lives and travel are supervised in ways that resemble probation and parole.[24] Dkt. 77, at 13 (quoting *United States v. Knights*, 534 U.S. 112, 119 (2001)). Like parolees, Plaintiffs contend they are not free to move where they wish or to live and work as other citizens, without supervision. *Smith*, 538 U.S. at 101.

In addition, Plaintiffs plausibly allege SORA resembles, at least in some respects, the ancient punishment of banishment. Specifically, the current version of SORA bars Plaintiffs from residing within five hundred feet of a school or daycare, measured from the nearest point of the exterior wall of the registrant's dwelling unit to the school's or

---

[24] Defendants argue SORA's reporting and other requirements cannot be analogized to probation or parole because SORA "itself applies after the registrant's incarceration ends. . . . [SORA's] requirements are distinct from the registrant's criminal sentence." Dkt. 76-1, at 8. As Plaintiffs note, ex post facto analysis looks to analogy, not the technicality of whether incarceration has informally ended. Dkt. 77, at 13 n. 3 (citing *Burgess v. Salmon*, 97 U.S. 381, 385 (1878) ("the ex post facto [clause] cannot be evaded by giving a civil form to that which is essentially criminal")). Moreover, under Defendant's rationale, SORA could impose nearly *any* potential restraint and not be considered punitive simply because such restraints apply after the offender is released from prison. The many cases Plaintiffs cite which have held various registration schemes violate the Ex Post Facto Clause illustrate this is not the case. *See generally*, Dkt. 73; Dkt. 77.

daycare's property line. Dkt. 73, ¶ 168 (citing I.C. § 18-8329(d)).[25]

Plaintiffs note the current version of SORA also bars them from "loitering" within five hundred feet from the property line of school or daycare grounds, including properties posted with a notice that they are used by a school or daycare, any time there are children present at the school or daycare for regular activities or within thirty minutes before or after such activities. *Id*., ¶ 169 (citing I.C. § 18-8329(b)).

Plaintiffs are also barred from applying for, or accepting employment at, any day care center, group day care facility, or family day care home. *Id*., ¶ 174 (citing I.C. § 18-8327(1)). Employers who hire registrants are listed on the public sex offender registry, further limiting Plaintiffs' available employment. *Id*., ¶¶ 174–175 (citing I.C. § 18-8305(1)(k)).[26]

In addition, SORA significantly limits Plaintiffs' ability to travel. For instance, Plaintiffs must provide in-person notice of their presence to law enforcement in the jurisdiction to which they travel, even if such jurisdictions do not impose a registration requirement. I.C. § 18-8309(2). Because sex offender laws are complex and vary from state to state, it is difficult for registrants to obtain accurate information about either affirmative reporting obligations (such as registering one's presence in a state), or prohibitions on ordinary behavior (such as visiting a library or park) in other jurisdictions. Plaintiffs allege they avoid interstate and intrastate travel due to the risk of unintentionally violating SORA.

---

[25] Plaintiffs are exempted from the exclusion zone within five hundred feet of a school if he or she established residency within the exclusion zone before July 1, 2006, and within five hundred feet of a daycare if he or she established residency within the exclusion zone before July 1, 2020. I.C. §§ 18-8329(d).

[26] This provision also applies to organizations where Plaintiffs volunteer.

Dkt. 73, ¶¶ 186–193.

Construing the Fourth Amended Complaint in the light most favorable to them, Plaintiffs plausibly allege SORA is like banishment because its restrictions significantly limit where they may legally live, "loiter," travel, and work. *Id.*, ¶¶ 163–178; *Snyder*, 834 F.3d at 702 (finding Michigan's sex offender registration law resembled banishment because offenders were forced to tailor much of their lives around school zones, and often had great difficulty finding places where they could legally live and work).[27]

　　　b.  Affirmative Disability or Restraint

To determine whether Plaintiffs have plausibly alleged SORA imposes an affirmative disability or restraint, the Court considers how the effects of SORA are felt by those who are subject to it. *Smith*, 538 U.S. at 100. "If the disability or restraint is minor and indirect, its effects are unlikely to be punitive." *Id*.

Plaintiffs allege SORA mandates multiple restraints that are far from minor, including: (1) lifetime registration, Dkt. 73, ¶¶ 150–154; (2) a lifetime of extensive requirements for in-person reporting and surveillance, with no good cause exceptions, and

---

[27] The Court rejects Plaintiffs' claim that SORA resembles traditional shaming punishments, Dkt. 77, at 13, because the Supreme Court and Ninth Circuit have repeatedly held laws requiring sex offender registration and notification merely "involve the dissemination of accurate information about a criminal record, most of which is already public. . . . Publicity may cause adverse consequences for the convicted defendant, running from mild personal embarrassment to social ostracism. In contrast to the colonial shaming provisions, however, the State does not make the publicity and the resulting stigma as an internal part of the objective of the regulatory scheme." *Smith*, 538–549 (cleaned up); *Masto*, 670 F.3d at 1057 ("Historical shaming punishments were intended to expose and publicly disgrace individuals, while sex offender registration laws disseminate accurate information about offenders for public safety purposes"); *Elk Shoulder*, 738 F.3d at 954 (rejecting Plaintiff's claim that, in part because of the availability of the internet, sex offender registration scheme resembled shaming punishments of the colonial period); *Maciel v. Cate*, 731 F.3d 928, 937 (9th Cir. 2013) (finding monthly reporting and publication of sexual offender information on the internet were regulatory and not punitive requirements).

criminal penalties for failure to report, *id*. at ¶¶ 155–162; (3) limitations on parenting, as registrants cannot volunteer at their children's schools or attend school events since they are generally restricted from being on the premises of any school building, school grounds, daycare, or conveyance owned or leased by a school or daycare if minors are present or will be present within a half hour, *id*. at ¶¶ 163, 166; (4) the inability to visit relatives given reporting requirements and the risk of unintentionally violating SORA, *id*. at ¶¶ 164–165; (5) limited housing and employment options,[28] *id*. at ¶¶ 167–178; and (5) significant limitations on travel, *id*. at ¶¶ 186–193.[29]

Although such restraints are not physical in nature, Plaintiffs contend SORA significantly controls their parenting, familial relationships, housing, employment, and travel. If they fail to comply with SORA, Plaintiffs risk serious punishment, including imprisonment, which is "the paradigmatic affirmative disability or restraint." *Smith*, 538 U.S. at 100 (citing *Hudson v. United States*, 522 U.S. 93, 104 (1997)). Although SORA's employment restrictions are less harsh than occupational debarment, which the Supreme Court has held nonpunitive, *Hudson*, 522 U.S. at 104, Plaintiffs identify restrictions far more onerous than those considered in *Smith*. Dkt. 73, at ¶¶ 150–201. Moreover, as the

---

[28] Of course, to succeed on the merits of their ex post facto claim, Plaintiffs will have to establish with evidence that SORA imposes substantial occupational and/or housing disadvantages for registrants that would not have otherwise occurred through the use of routine background checks by employers and landlords. *Smith*, 538 U.S. at 100. For purposes of the instant Motion to Dismiss, Plaintiffs have plausibly alleged SORA imposes significant restrictions on housing and employment. Dkt. 73, ¶¶ 167–178.

[29] Defendants contend many of Plaintiffs' allegations regarding the restrictions SORA imposes are "wrong as a matter of law or irrelevant." Dkt. 76-1, at 6 n. 4. For instance, the restrictions on living near, working for, or being on the premises of a school or daycare have several exceptions. *Id*. Whether such exceptions, other provisions of SORA, or the way SORA is enforced reduce the housing, employment, and other restrictions SORA imposes are issues for summary judgment or trial. At this stage of the proceedings, the Court must accept Plaintiffs' allegations as true.

Sixth Circuit explained in *Snyder*, "surely, something is not 'minor and indirect' just because no one is actually being lugged off in cold irons bound. Indeed, those irons are always in the background since failure to comply carries with it the threat of serious punishment, including imprisonment." 834 F.3d at 704.

In short, Plaintiffs plausibly allege the totality of restraints SORA imposes are significant and direct.

c.   Traditional Aims of Punishment

The traditional aims of punishment are incapacitation, retribution, and deterrence. *Graham v. Florida*, 560 U.S. 48, 71 (2010); *Snyder*, 834 F.3d at 704. One of the express goals of SORA is to deter registrants from re-offending. I.C. § 18-8302 (explaining "public access assists the community in being observant of convicted sexual offenders in order to prevent them from recommitting sexual crimes").[30]

Plaintiffs allege SORA is also retributive because it imposes lifetime registration on all registrants convicted of an aggravated offense, without any individual assessment of a registrant's dangerousness. Dkt. 77, at 13. When a restriction is "imposed equally upon all offenders, with no consideration given to how dangerous any particular registrant may be to public safety, that restriction begins to look far more like retribution for past offenses than regulation intended to prevent future ones." *Commonwealth v. Baker*, 295 S.W. 3d 437, 444 (Ky. 2009)); *see also Doe v. State*, 189 P.3d 999, 1014 (Alaska 2008) (stating

---

[30] However, "[a]ny number of governmental programs might deter crime without imposing punishment. To hold that the mere presence of a deterrent purpose renders such sanctions criminal would severely undermine the Government's ability to engage in effective regulation." *Smith*, 538 U.S. at 102.

when a law "determines who must register based not on a particular determination of the risk the person poses to society but rather on the [conviction]," it creates a "retributive effect that goes beyond any non-punitive purpose and that essentially serves the traditional goals of punishment").[31] As noted, Plaintiffs also risk incarceration—the paradigmatic aim of punishment—if they fail to comply with SORA's provisions. I.C. § 18-8311; *Smith*, 538 U.S. at 100.

In short, Plaintiffs plausibly allege SORA promotes the traditional aims of punishment.[32]

### d. Rational Relationship to a Nonpunitive Purpose

SORA's "rational connection to a nonpunitive purpose" is the "most significant factor" in assessing whether the statute is punitive in purpose or effect. *Smith*, 538 U.S. at 102 (cleaned up). However, a statute "is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aim it seeks to advance." *Id*. at 103. Defendants

---

[31] In his concurrence in *Smith*, 538 U.S. at 109, Justice Souter similarly explained:

> The fact that the Act uses past crimes as the touchstone, probably sweeping in a significant number of people who pose no real threat to the community, serves to feed suspicion that something more than regulation of safety is going on; when a legislature uses prior convictions to impose burdens that outpace the law's stated civil aims, there is room for serious argument that the ulterior purpose is to revisit past crime, not prevent future ones.

[32] Defendants argue SORA's regulations "pale in comparison to living in prison," and that a would-be sex offender will "thus be deterred (if at all) by the prospect of a long prison sentence, not by the Act's regulations." Dkt. 76-1, at 9. Defendants also suggest SORA is not retributive because its regulations are "forward looking, protecting the community and children from future crimes—not requiring the registrant to pay a penalty for the past." *Id*. at 10. In addition, Defendants highlight that SORA does not incapacitate registrants, but rather leaves registrants "generally free to live, work interact, recreate, and otherwise participate in the Idaho community in which they reside." *Id*. The parties will have the opportunity to address SORA's purportedly punitive effects—or lack thereof—after discovery. For purposes of the instant Motion, Plaintiffs have plausibly alleged that regardless of its regulatory intent, SORA's effects nevertheless serve the traditional aims of punishment.

argue SORA "provides an essential regulatory purpose that assists law enforcement and parents in protecting children and communities." Dkt. 76-1, at 10 (quoting *Glodowski*, 463 P.3d at 409). To advance Idaho's interest in protecting its communities, and especially its children, from sexual abuse, Defendants contend it is reasonable for Idaho to inform its citizens about individuals who have committed a sex crime, and to prevent recidivism by protecting children from sex offenders while they are at school or daycare, when their parents are not present to protect them. Dkt. 79-1, at 11 (citations omitted).

Plaintiffs counter that other courts, after assessing a full record, have found "significant doubt by recent empirical studies [that] . . . [t]he risk of recidivism posed by sex offenders is frightening and high." Dkt. 77, at 15 (quoting *Snyder*, 834 F.3d at 704). In fact, in *Snyder*, the record revealed that registration laws either did not affect recidivism, or even increased recidivism, most likely because such laws exacerbate risk factors for recidivism by making it difficult for registrants to find jobs and housing, and to reintegrate into society. *Snyder*, 834 F.3d at 704–705. Here, Plaintiffs allege that in addition to heightened registration obligations, SORA retroactively subjects them to significant restrictions on where they can live, work, and travel. Dkt. 73, at ¶¶ 167–178, 186–193.

Plaintiffs also contend SORA lacks a rational relationship to recidivism because it imposes lifetime registration on those convicted of an aggravated offense without any individualized assessment of an offender's proclivities or dangerousness.[33] Dkt. 77, at 16

---

[33] However, "the Ex Post Facto Clause does not preclude a State from making reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences." *Smith*, 538 U.S. at 103. A developed record will assist the parties in arguing, and the Court in assessing, whether SORA's distinction between aggravated offenders required to register for life, and non-aggravated offenders permitted to petition for release from the registration requirement after ten years, is reasonable.

(citing *Snyder*, 834 F.3d at 705). Plaintiffs suggest lifetime registration is particularly irrational, as a developed record will show that recidivism drops off dramatically over time. *Id*. In fact, none of the six Plaintiffs have reoffended in the decades since their conviction of the offense for which they must register for life. Dkt. 73, at ¶¶ 16, 19, 26, 31, 36, 45, 51, 54, 63, 65, 73, 76.

With respect to Defendants' contention that SORA assists law enforcement and parents in protecting children and communities, Plaintiffs highlight that registrants may work next to a school but may not live near a school. Plaintiffs note "'it is difficult to see how public safety is enhanced' by prohibiting registrants from living near a school, as they would be near the school mostly at night—when no children are present—but allowing registrants to be near the school during the day—when children are present."[34] Dkt. 77, at 16 (quoting *Baker*, 295 S.W.3d at 445). Similarly, Plaintiffs argue SORA's reporting requirements when registrants travel out of state make little sense, as most other jurisdictions do not require them to report, and they are often turned away without any actual monitoring. Dkt. 77, at 16 (citing Dkt. 73, at ¶¶ 188–89, 191–92).

Ultimately, the Court finds whether SORA's extensive regulations actually assist law enforcement and parents in protecting Idaho's children and communities, and prevent recidivism, are issues appropriately reserved for summary judgment, after the parties have had the opportunity to develop the record. *See generally*, *Smith*, 538 U.S. 84 (reviewing

---

[34] Of course, although SORA allows sex offenders to work near a school or daycare, it prevents them from working for a school or daycare. As Defendants note, the latter provision of SORA reduces the chance that children will view a sex offender as a trusted authority figure. Dkt. 76-1, at 11.

constitutionality of Alaska Sex Offender Registration Act on appeal from rulings on cross-motions for summary judgment); *Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1 (2003) (reviewing on appeal from grant of summary judgment on constitutional challenges to Connecticut's sex offender registry law); *Neal*, 131 F.3d 818 (reviewing on appeal from grant of summary judgment on prisoners' constitutional challenges to Hawaii's sex offender treatment program).

At this stage of the proceedings, Plaintiffs plausibly allege that SORA lacks a rational connection to a nonpunitive purpose because SORA purportedly does not, in fact, reduce recidivism or assist law enforcement and parents in protecting children. Dkt. 73, ¶¶ 145, 150–154.

e.  Excessiveness

With respect to whether a retroactive law is excessive, the Supreme Court has explained courts are not asked to "determine[e] whether the legislature has made the best choice possible to address the problem it seeks to remedy." *Smith*, 538 U.S. at 105. Instead, the "question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective." *Id*.

Defendants argue SORA protects communities by making citizens aware of sex offenders in the area and protects children by limiting the opportunities for a sex offender to be near a child or to earn a child's trust when the child's parents are not present for protection. Defendants suggest SORA offers these protections in a careful way, such as by creating five hundred feet safe zones around schools and daycares, which is a lesser distance than those imposed by other states. Dkt. 76-1, at 12 (noting California and

Mississippi mandate four to six times larger safe zones around schools and daycares). Defendants also highlight there are many exceptions to SORA's restrictions—such as allowing offenders to receive permission to pick up or drop off their own children at school or to attend their children's extracurricular activities—which lessen the restraint such safe zones impose. *Id*.

Plaintiffs argue that given the above-discussed uncertainty about SORA's efficacy, the restraints it imposes are excessive. Plaintiffs highlight that *Snyder* and other courts have deemed "super registration" schemes like SORA excessive, especially absent an individualized risk assessment. Dkt. 77, at 16–17 (citing *Snyder*, 834 F.3d at 705) (explaining the punitive effects of blanket restrictions on where registrants can live, work, and loiter far exceeded "even a generous assessment of their salutary effects"); *see also People v. Betts*, 968 N.W. 2d 497, 515 (Mich. 2021) ("[D]emanding and intrusive requirements, imposed uniformly on all registrants regardless of an individual's risk of recidivism, were excessive in comparison to SORA's asserted public-safety purpose."); *Wallace v. State*, 905 N.E.2d 371, 384 (Ind. 2019) (finding public safety goals did not "render as non-punitive a statute that is so broad and sweeping," absent a mechanism to seek removal "even on the clearest showing of rehabilitation"); *Doe v. State*, 111 A.3d 1077, 1100 (N.H. 2015) (stating absent a "meaningful risk to the public . . . [lifetime registration] becomes wholly punitive"); *Baker*, 295 S.W. at 446 ("Given the drastic consequences . . . and the fact that there is no individual determination of the threat a particular registrant poses to public safety, we can only conclude that [the law] is excessive with respect to the non-punitive purpose of public safety."); *Starkey v. Okla. Dep't of Corr.*,

305 P.3d 1004, 1030 (Okla. 2013) (finding registration statute was excessive in relation to non-punitive purpose because its "many obligations impose[d] a severe restraint on liberty without a determination of the threat a particular registrant pose[d] to public safety"); *State v. Pollard*, 908 N.E. 2d 1145, 1153 (Ind. 2009) (holding statute exceeded non-punitive purpose because it restricted residency "without considering whether particular offender is a danger").

Given the questions Plaintiffs have raised regarding SORA's rational relationship to a nonpunitive purpose, in addition to their allegations regarding the extreme hardships SORA imposes without an individualized assessment of a registrant's dangerousness, Dkt. 73, at ¶¶ 150–201, Plaintiffs plausibly allege that SORA is excessive despite its nonpunitive policy.

In sum, after assessing the *Smith* factors, the Court finds Plaintiffs plausibly allege the effects of SORA are punitive. Plaintiffs' ex post facto claim accordingly survives dismissal.

f.   Double Jeopardy

"[T]he inquiry into whether a law constitutes retroactive punishment in violation of the Double Jeopardy Clause is identical to that with respect to the Ex Post Facto Clause." *Litmon*, 768 F.3d at 1242. Because the Court finds Plaintiffs state an ex post facto claim, they state a double jeopardy claim as well.

## V. CONCLUSION

Plaintiffs have plausibly alleged that SORA is so punitive in effect that it negates the Idaho legislature's intent to enact a civil regulatory scheme. As such, Plaintiffs' ex post

facto and double jeopardy claims survive the instant Motion to Dismiss. Given the Ninth

Circuit's holding in *Wasden*, 982 F.3d at 794, the Court also finds Plaintiffs' FERPA claim

must proceed. Although Plaintiffs may litigate each of their claims, it is important to note

that the Court is *not*, at this juncture, holding SORA is facially unconstitutional. To find

SORA unconstitutional, "'only the clearest proof' will suffice to override legislative intent

and transform what has been denominated a civil remedy into a criminal penalty." *Smith*,

538 U.S. at 92 (citing *Hudson*, 522 U.S. at 100). In light of this standard, Plaintiffs must

carry a heavy burden to ultimately succeed on their claims.

## VI. ORDER

**IT IS HEREBY ORDERED**:

1. Defendants' Motion to Dismiss (Dkt. 76) is **DENIED**;

2. The previous Scheduling Order (Dkt. 75) is **VACATED**;

3. The Court will send out a new Litigation Order and Notice of Telephonic

   Scheduling Conference following entry of this Order.

DATED: June 29, 2023

David C. Nye
Chief U.S. District Court Judge