Matthew Strugar (*pro hac vice*)
LAW OFFICE OF MATTHEW STRUGAR
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90010
T: (323) 696-2299
matthew@matthewstrugar.com

David B. Rankin (*pro hac vice*)
BELDOCK LEVINE & HOFFMAN, LLP
99 Park Avenue, PH/26th Floor
New York, New York 10016
T: (212) 277-5825
drankin@blhny.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JANE DOE #36, JOHN DOE #64, JOHN DOE #115, and JOHN DOE #117, <br><br> Plaintiffs, <br><br> v. <br><br> RAÚL LABRADOR, Attorney General of the State of Idaho; and COLONEL BILL GARDINER, Director of the Idaho State Police, in their official capacities, <br><br> Defendants. | Case No. 1:16-cv-429-DCN <br><br><br> **PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT** |

**Table of Contents**

Introduction ................................................................................................................ 1

Legal Standard ........................................................................................................... 2

Background and Facts ................................................................................................. 2

Argument .................................................................................................................... 4

I.    The Ex Post Facto Clause Was Designed to Guard Against Retroactive Legislation
      Targeting Unpopular Groups. ........................................................................... 5

II.   Courts in Recent Years Have Found Next-Generation Registration Laws to Violate the
      Ex Post Facto Clause because They Are Punishment. ...................................... 6

III.  SORA Is Punishment. ..................................................................................... 10

      A.   SORA Imposes Severe and Affirmative Disabilities and Restraints. .......... 10

      B.   SORA Imposes Sanctions Historically Regarded as Punishment. .............. 12

      C.   SORA Serves the Traditional Aims of Punishment. ................................... 15

      D.   SORA Is Irrationally Related to its Purported Non-Punitive Purpose. ....... 17

      E.   SORA Is Excessive in Relation to Non-Punitive Interests. ......................... 19

Conclusion ............................................................................................................... 20

**Introduction**

Plaintiffs are four Idaho residents who pleaded guilty to sex offense crimes between 1988 and 2004. They are 48, 60, 62, and 79 years old. They were each incarcerated, each completed their sentences, and none have reoffended. Since then, the State of Idaho has added new punishments and progressively stripped them of fundamental liberties, imposing a lifetime of punishment upon them. Idaho's Sexual Offenders Registration Notification and Community Right-to-Know Act, known as SORA, now subjects Plaintiffs to pervasive supervision and control. The law requires them to frequently report a vast array of information to law enforcement and to regularly report in person. It restricts where they can live, work, and be, and how they can travel. It subjects them to an array of state-imposed restrictions that encompass virtually every facet of their lives. Violations carry prison terms of up to 10 years. No Plaintiff would have predicted these requirements when they pleaded guilty. But they must comply until they die.

It was not always so. When first created in 1993, Idaho's registry was a non-public database of convictions used by law enforcement. Over the last three decades, the Idaho Legislature repeatedly amended SORA, transforming registration from a list of convictions in a police database to today's complex system of public reporting and control. Even though Plaintiffs were sentenced—and in some cases completed their sentences—before most or any of these restrictions came to be, the State retroactively applies them to Plaintiffs.

By repeated amendments to SORA, Idaho transformed a civil law into a statute that imposes punishment. Idaho is, of course, free to impose punishment prospectively. And it has for thousands of registrants. But what Idaho cannot do is reach into the past and impose punishment retroactively, changing the terms of plea bargains and sentences finalized years or decades earlier. That is a violation of the *Ex Post Facto* Clause and renders SORA unconstitutional.

**Legal Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court construes the evidence in the light most favorable to the non-moving party. *See Barlow v. Ground*, 943 F.2d 1132, 1134 (9th Cir. 1991). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Thus, summary judgment for the moving party is proper when a "rational trier of fact" would be unable to find for the non-moving party based upon the record. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**Background and Facts**

Decades ago, Plaintiffs pleaded guilty to crimes that, unbeknownst to them, Idaho would re-punish them for, again and again, long after they were sentenced. Jane Doe #36 and John Doe #117 both pleaded guilty to Lewd Conduct with a Minor Child Under the Age of Sixteen Years. Plaintiffs' Statement of Material Fact (SMF) 1, 7. In Oklahoma, John Doe #64 pleaded guilty to Lewd Acts to a Child. SMF 3. At eighteen, John Doe #115 committed Assault with Intent to Commit a Serious Felony. SMF 5.

When John Doe #64 pleaded guilty in 1988, he was not subject to any registry because Oklahoma had no registry; when it enacted one 1989, it did not operate retroactively. SMF 4; 57 Okl. Stat. § 57-582 (1989). He was only made to register when he moved to Idaho in 2000, after living more than a decade in the community offense-free. SMF 4. When John Doe #115 pleaded guilty in 1995, Idaho only required him to register in a non-public law enforcement database for ten years. SMF 6. When Jane Doe #36 and John Doe #117 pleaded guilty in 2004 and 2002

2

(respectively), Idaho had a public registry with a default life duration, but the law still provided a mechanism for them to petition for release from registration. SMF 2, 8.

All Plaintiffs completed their criminal sentences and sex offender treatment programs. SMF 9. None have reoffended. SMF 1, 3, 5, 7. They each, however, became subject to Idaho's retroactive amendments requiring them to register as sex offenders for their lifetime.

Prior to 1993, people in Idaho convicted of sexual offenses faced formal consequences similar to those faced by individuals convicted of similarly serious non-sexual crimes: the person would be convicted and serve punishment (usually in the form of incarceration), after which they might be paroled, or if not, released when they completed their sentence. Then they could attempt to reintegrate into society. That changed when Idaho enacted its initial sex offender registration law in 1993. It established a statutory duty for persons convicted of one of ten listed felony sex crimes to register with their local sheriff. I.C. § 18-8304 (1993). The law came into effect on July 1, 1993, and applied retroactively to anyone who was currently incarcerated on a newly-registrable offense or "under probation or parole supervision" on that date. I.C. § 18-8304(1)(c) (1993). Registrants were subject to the law for "ten (10) years after the date of discharge from probation, parole or release from incarceration, whichever is greater." I.C. § 18-8305 (1993). The registration information was not made affirmatively available to the public.

In the ensuing years, the Idaho Legislature expanded the registration law to cover more people for longer periods, requiring ever more reporting from registrants, making that information available to the public, and both imposing restrictions on where registrants can work, live, or be and ratcheting those restrictions to become stricter and stricter.[1] Because they are too numerous to

---

[1] Plaintiffs provide a detailed account of the amendments to SORA as Exhibit B to the Declaration of Matthew Strugar ("Strugar Decl.").

detail here, Plaintiffs provide a summary of expansive obligations SORA imposes in a separate appendix. *See* Summary of Obligations, Ex. A to Strugar Decl.

What started as a registry for law enforcement officials, applicable to ten offenses and lasting only ten years, now captures 30 offenses and applies for life. The modern version of SORA determines where registrants can live, work, or loiter; whether and how they can pick their children up from school or attend their extracurricular activities; and how they can travel. It requires registrants to engage in frequent reporting to law enforcement of everyday activities as banal as setting up an account to use a website. Eight registrable crimes are now designated "aggravated," as are any of the remaining twenty-three crimes if the victim is younger than thirteen years old. I.C. § 18-8303(1). Only those convicted of non-aggravated offenses are eligible to petition for removal after ten years. I.C. §§ 18-8307(7); 18-8310(1). Registrants must pay $80 a year to be registered. I.C. § 18-8307(2). SORA's scope has grown to encompass more crimes and more people for longer terms, while ratcheting up the restrictions on registrants' lives and liberty through near-annual amendments.

The law sweeps up about 5,200 Idahoans, or about 26 out of every 10,000 residents. SMF 10. This includes 12 registrants who are 90 years old or older, and more than 1,600 who are 60 years old or older. SMF 11–14. It includes people whose only registrable offense took place 50 or more years ago. SMF 17. And it includes more than 600 registrants whose only registrable conviction was prior to July 1, 1993, when there was no registration law at all. SMF 16.

### Argument

Plaintiffs seek summary judgment on their Ex Post Facto claim. Like all Ex Post Facto challenges, it is a facial challenge. *Doe v. Wasden*, 982 F.3d 784, 791 (9th Cir. 2020).

4

I.     **The Ex Post Facto Clause Was Designed to Guard Against Retroactive Legislation Targeting Unpopular Groups.**

The United States Constitution recognizes the government's authority to punish criminal behavior, but it imposes important limits on how that power is exercised. One of the most critical limitations is found in the Ex Post Facto Clause, U.S. Const. art. I, § 10, cl. 1, which forbids the government from retroactively increasing the punishment for a crime after it has been committed. As the Supreme Court explained in *Collins v. Youngblood*, legislatures cannot "retroactively alter the definition of crimes or increase the punishment for criminal acts," 497 U.S. 37, 43 (1990). This principle—*nulla poena sine lege*, or "no punishment without law"—is fundamental to any legal system that respects the rule of law. Citizens must have fair notice of what conduct is criminal and what penalties apply.

The Framers included the Ex Post Facto Clause in response to widespread abuses by state legislatures in the years following independence. Retrospective laws were often used to punish political enemies or confiscate property without due process. States like Maryland and North Carolina condemned such laws as "oppressive" and "incompatible with liberty" in their early constitutions. Maryland Const. of 1776, A Declaration of Rights, art. XV; North Carolina Const. of 1776, A Declaration of Rights, art. XXIV. During the Constitutional Convention, prominent figures such as James Wilson and Oliver Ellsworth denounced ex post facto laws as so unjust that they should be considered void even without a constitutional prohibition. 2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 376 (Max Farrand ed. 1911). James Madison called them "contrary to the first principles of the social compact." THE FEDERALIST No. 44, at 287 (James Madison) (Isaac Kramnick ed. 1987).

The Supreme Court has likewise recognized that the Ex Post Facto Clause serves several intertwined purposes: it protects socially disfavored groups from vindictive legislation, it preserves

5

the separation of powers (wherein the legislature defines the law prospectively, while the judiciary then applies that law retrospectively), and it protects the core individual right to notice of criminal prohibitions and punishments. *Weaver v. Graham*, 450 U.S. 24, 28–29 (1981). The clause "restricts governmental power by restraining arbitrary and potentially vindictive legislation." *Id*. at 29. The legislature's "responsivity to political pressures poses a risk that it may be tempted to use retroactive legislation as a means of retribution against unpopular groups or individuals." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 266 (1994). Thus, as Chief Justice Marshall observed in *Fletcher v. Peck*, a core reason for the Ex Post Facto Clause was to bar legislatures from enacting retroactive punishments when they were caught up in the "feelings of the moment" and subject to "sudden and strong passions" toward a particular population. 10 U.S. 87, 137–38 (1810).

The fact that "sex offenders are so widely feared and disdained ... implicates the core counter-majoritarian principle embodied in the Ex Post Facto clause." *Does #1-5 v. Snyder*, 834 F.3d 696, 705–06 (6th Cir. 2016), *cert. denied*, 138 S. Ct. 55 (2017) (*Snyder*). The dangers that motivated adoption of the Ex Post Facto Clause are the exact dangers presented by SORA's retroactivity. At the time of their convictions and sentencings, Plaintiffs could not imagine that they would later be subjected to life-long punitive restrictions and a life-altering registration regime.

## II. Courts in Recent Years Have Found Next-Generation Registration Laws to Violate the Ex Post Facto Clause because They Are Punishment.

The Supreme Court held in 2003 that the application of a registration law to offenders whose crimes took place prior to the registry's adoption did not, without more, violate the Ex Post Facto clause because a simple registry, without additional restrictions or obligations, is not inherently punishment. *Smith v. Doe*, 538 U.S. 84 (2003). The Court considered the retroactive application of Alaska's registration law that consisted of "two components: a registration requirement and a notification system." *Id*. at 90.

6

To determine whether an act the Alaska legislature intended to be regulatory was "so punitive either in purpose or effect as to negate the State's intention to deem it civil," *id.* at 92 (cleaned up), the Court used five factors that serve as non-dispositive "guideposts": (1) Does the law impose an affirmative disability or restraint?; (2) Does it inflict what has been regarded in our history and traditions as punishment?; (3) Does it promote the traditional aims of punishment?; (4) Does it have a rational connection to a non-punitive purpose?; (5) Is it excessive with respect to this purpose? *Id.* at 97 (citing *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963)). The Court added that, because a legislature is entitled to considerable deference when it states its purpose, "only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Id.* at 92 (cleaned up).

Applying those factors, the Court concluded that Alaska's then-existing registration system's "minor and indirect" effects were not punitive. *Id.* at 100. Among the grounds for its conclusion was that the Alaska's law "impose[d] no physical restraint," did not require registrants to report in person, and, unlike with criminal regimes such as probation, "offenders subject to the Alaska statute are free to move where they wish and to live and work as other citizens, with no supervision." *Id.* at 100–01. Violations of the law were only a misdemeanor. Alaska Stat. § 11.56.840(B) (1998). Only recidivists and those convicted of a small subset of extreme crimes—first-degree murder involving sexual assault or abuse, first degree sexual assault, and first-degree sexual abuse of a minor—required lifetime registration. *Smith*, 538 U.S. at 90, *see* Alaska Stat. §§ 12.63.010(d)(2) (1998); 12.63.020(a)(1) (1998).

*Smith* was a difficult case, with a concurrence in the judgment from a Justice Souter who emphasized it was a close case. 538 U.S. at 110 (Souter, J., concurring). In the wake of *Smith*, three main developments have changed the landscape of registration.

7

First, legislatures, acting with just the sort of passion that the Ex Post Facto Clause was meant to curb, responded by enacting "super-registration" laws that did just what the Supreme Court found Alaska's 1998 law did not: require registrants to report in person and—like criminal regimes such as probation—supervise and otherwise limit registrants' freedom to live, work, and travel as other citizens. *See* Catherine Carpenter & Amy Beverlin, *The Evolution of Unconstitutionality in Sex Offender Registration Laws*, 63 HASTINGS L. J. 1071 (2012).

Second, social science about sexual offenders' recidivism rates and the effectiveness of community notification registration systems like SORA has advanced since *Smith*, showing two main findings that undercut *Smith*'s reasoning: first, recidivism of sexual offenders is not as dramatic as believed at the time the Court decided *Smith*, *see* Ira Ellman & Tara Ellman, "*Frightening and High": The Supreme Court's Crucial Mistake About Sex Crime Statistics*, 30 CONST. COM. 495 (2015), and second—more importantly—community notification registries like SORA are not effective in reducing sexual offense recidivism. SMF 19–49.

Third, the form, function, and reach of technology has dramatically advanced since 2003—both on the internet itself and the registry information published on the internet—making modern registration far from "a visit to an official archive of criminal records" the Court analogized to in *Smith*, 538 U.S. at 99. SMF 52–58. The Idaho registry now encourages mapping and tracking registrants, not just accessing their archival information. SMF 52–53. And scrapers and search engine optimization often push registration status results on people who are not looking for it. SMF 56.

In the wake of these changes, courts across the country have concluded that burdensome next-generation sex offender restrictions have crossed the line from regulatory to unconstitutionally punitive—including Alaska's own expanded registration law. *See, e.g.*, *Does v. Whitmer*, 751

8

F.Supp.3d 761, 784–95 (E.D. Mich. 2024) (finding amendments to Michigan registration law violated Ex Post Facto clause); *State v. Hinman*, 530 P.3d 1271, 1276, 1278 (Mont. 2023) (overturning prior decision finding earlier registration law was not punitive because "[a]ll the features of the Act that supported [the previous] decision … changed dramatically since the law's amendments in 2007, 2013, 2015, and 2017" and acknowledging a "growing body of research into the effectiveness of sex offender registries has cast significant doubt on their capacity to prevent recidivism"); *People v. Betts*, 968 N.W.2d 497, 504–15 (Mich. 2021) (finding retroactive imposition of amendments to Michigan registration law, which obligated in-person reporting and imposed restrictions on residency and employment, violated Ex Post Facto clause); *Snyder*, 834 F.3d at 699–706 (finding retroactive imposition of amendments to Michigan's registration law violated Ex Post Facto clause); *Doe v. Alaska*, 189 P.3d 999, 1017 (Alaska 2008) (holding, despite *Smith*, that an amended Alaska registration system was punishment).[2]

Idaho's modern SORA law is vastly more restrictive than the law upheld by the Supreme Court in 2003. Its obligations far exceed the registration and notification system at issue in *Smith*,

---

[2] *See also Doe v. New Hampshire*, 111 A.3d 1077, 1100–02 (N.H. 2015) (holding that the sex offender "statute has changed dramatically … to the point where the punitive effects are no longer 'de minimis'"); *Starkey v. Okla. Dep't of Corr.*, 305 P.3d 1004, 1030 (Okla 2013) (holding retroactive application of Oklahoma's sex offender restrictions was punishment); *Doe v. Dep't of Pub. Safety and Corr. Servs.*, 62 A.3d 123, 143 (Md. Ct. App. 2013) ("The application of the statute has essentially the same effect upon Petitioner's life as placing him on probation and imposing the punishment of shaming for life, and is, thus, tantamount to imposing an additional sanction for Petitioner's crime."); *State v. Williams*, 952 N.E.2d 1108, 1112–13 (Ohio 2011) ("The statutory scheme has changed dramatically…[W]e conclude that imposing the current registration requirements on a sex offender whose crime was committed prior to the enactment of S.B. 10 is punitive."); *Wallace v. State*, 905 N.E.2d 371, 384 (Ind. 2009) ("Thus, the non-punitive purpose of the Act, although of unquestioned importance, does not serve to render as non-punitive a statute that is so broad and sweeping."); *State v. Letalien*, 985 A.2d 4, 26 (Me. 2009) (holding that "the retroactive application of the lifetime registration requirement and quarterly in-person verification procedures of SORN … is punitive"); *Com v. Baker*, 295 S.W.3d 437, 447 (Ky. 2009) (holding that Kentucky's "residency restrictions are so punitive in effect as to negate any intention to deem them civil").

including requirements to report in person; supervision and other limits on registrants' freedom to live and travel as other citizens that resemble criminal regimes such as probation; lifetime duration; and violations punished as a serious felony. *See* Strugar Decl., Ex. B, Summary of Obligations. *Smith* did not contemplate laws like this, and its reasoning—and the reasoning of many courts that have analyzed similar laws—show that this law is unconstitutional.

## III.   SORA Is Punishment.

The collective effects of SORA have crossed into punishment under the *Mendoza-Martinez* factors: (1) SORA imposes affirmative disabilities and restraints; (2) it imposes sanctions historically regarded as punishment; (3) it promotes the traditional aims of punishment; (4) it is irrationally connected to its non-punitive purpose; and (5) it is excessive in relation to its non-punitive purpose. *Mendoza-Martinez*, 372 U.S. at 168–69.

### A.  SORA Imposes Severe and Affirmative Disabilities and Restraints.

SORA imposes affirmative disabilities and restraints associated with punishment. *Smith*, 538 U.S. at 100. "If the disability or restraint is minor and indirect, its effects are unlikely to be punitive." *Id*. But the inverse is also true. And SORA imposes direct restrictions on where registrants are allowed to live, work, and move; significant and burdensome responsibilities that including frequent contact with law enforcement; and other disabilities. *See* Ex. B, Summary of Obligations. They must report to law enforcement all types of information on tight timeframes, including immediate reporting anytime they create an account on a website and reporting within two workings days any change in their name, residence, employment, or student status. *Id.*, § XI. They must immediately report any travel lasting seven days or longer. *Id.* They must immediately report any changes to their vehicle information. *Id*. These affirmative disabilities are directly imposed by SORA itself, separate from and in addition to the indirect consequences of the increased public accessibility of the criminal record.

Regularly reporting comprehensive details of one's life to law enforcement and being restricted from where one can work, live, volunteer, or loiter are neither minor nor indirect—they are substantial disabilities and restraints on individual liberty. *See Betts*, 968 N.W.2d at 511–12.[3] Registration alone also bars access to public housing, 24 C.F.R. 982.553(a)(2), and results in identification as a sex offender on one's passport, 22 U.S.C. § 212b.

SORA also ensures adherence to its many requirements on the potential for imposition of up to 10 years' imprisonment. I.C. § 18-8311; see *Snyder*, 834 F.3d at 703. "Imprisonment is the 'paradigmatic' affirmative restraint." *Betts*, 968 N.W. 2d at 510 (quoting *Smith*, 538 U.S. at 86). For registrants, the threat of "being lugged off in cold irons bound ... [is] always in the background." *Snyder*, 834 F.3d at 703.

In *Smith*, by contrast, the Court found that Alaska's then-existing registration requirement did not impose a punitive disability or restraint on offenders. The *Smith* Court reached its conclusion for several reasons, none of which apply here.

First, the Court emphasized that the Alaska statute required only calling the police once a year or, in some cases, once a quarter. "The Alaska statute, on its face, does not require these updates to be made in person. And … the record contains no indication that an in-person appearance requirement has been imposed on any sex offender subject to the Act." *Smith*, 538 U.S. at 101. The Court noted that the lower court factually erred in finding that the statute had in-person

---

[3] *See also State v. Pollard*, 908 N.E.2d 1145, 1150 (Ind. 2009) (distinguishing *Smith* because exclusion zones impose barriers that are "neither minor nor indirect," but create "a substantial housing disadvantage" that limits "one's freedom to live on one's own property"); *Baker*, 295 S.W.3d at 445 (finding it "difficult to imagine that being prohibited from residing within certain areas does not qualify as an affirmative disability"); *Wallace*, 905 N.E.2d at 380 (registration is affirmative disability because it leads to lost employment opportunities and housing discrimination); *United States v. Juvenile Male*, 590 F.3d 924, 935 (9th Cir. 2010), *vacated as moot*, 564 U.S. 932 (2011) (per curiam) (invalidating registration statute that "seriously jeopardizes the ability … to obtain employment, housing, and education").

reporting requirements, but the Court's language strongly suggests that if such requirements had existed, they would have constituted affirmative disabilities and restraints. *Id*. Here, by contrast, Idaho requires in-person reporting, I.C. § 18-8309(1), and "immediate" notification of a variety of information. I.C. § 18-8309(2)–(3). *See Whitmer*, 751 F.Supp.3d at 791 (E.D. Mich. 2024) (in-person registration and the threat of imprisonment for failure to register alone qualify as significant disabilities and restraints).

Second, the Alaska law did not otherwise directly restrict registrants' freedoms; *Smith* emphasized that they were "free to move where they wish and to live and work as other citizens, with no supervision" other than needing to inform the police afterward. *Smith*, 538 U.S. at 101. In Idaho, in contrast, registration triggers restrictions on residency, work, and movement, as detailed above.

### B.  SORA Imposes Sanctions Historically Regarded as Punishment.

SORA meets the widely accepted definition of punishment: "(1) it involves pain or other consequences typically considered unpleasant; (2) it follows from an offense against legal rules; (3) it applies to the actual (or supposed) offender; (4) it is intentionally administered by people other than the offender; and (5) it is imposed and administered by an authority constituted by a legal system against which the offense was committed." *Snyder*, 834 F.3d at 701 (citing H.L.A. Hart, *Punishment and Responsibility* 4–5 (1968)).

SORA's reporting and surveillance scheme resembles the traditional punishments of probation and parole. *United States v. Knights*, 534 U.S. 112, 119 (2001) (probation is punishment). Again, registrants must report in person annually, must either report immediately or within two days when virtually any reportable information changes or they intend to travel more than seven days. These reporting requirements, along with restrictions on where registrants can work, live, and loiter, have "essentially the same effect on [registrants'] li[ves] as placing [them] on probation"

12

(apart from having an individual probation officer). *Dep't of Pub. Safety*, 430 Md. at 561 (2013). These requirements include no good cause exceptions, and like probation or parole, noncompliance can lead to imprisonment. Failure to follow SORA's reporting requirements is a felony punishable by ten years' imprisonment, which exceeds what many probationers or parolees face for violations. I.C. § 18-8311. Registrants are under "significant state supervision," and a failure to comply with these restrictions, "like the failure to comply with parole conditions, potentially subjects the offender to imprisonment." *Betts*, 968 N.W.2d at 510.[4]

In *Smith*, the Court took seriously the claim that registration requirements, even taken alone, were analogous to probation or supervised release, but ultimately rejected the argument because solely a reporting requirement was at issue, and not a direct restriction on liberty:

> This argument has some force, but, after due consideration, we reject it. Probation and supervised release entail a series of mandatory conditions and allow the supervising officer to seek the revocation of probation or release in case of infraction. By contrast, offenders subject to the Alaska statute are free to move where they wish and to live and work as other citizens, with no supervision.

538 U.S. at 101. In Idaho, registrants are not "free to move where they wish and to live and work as other citizens"; their actions need not merely be reported but are directly constrained. Moreover, they also are required to appear in person at police departments under a long list of circumstances (unlike under the then-existing Alaska law), and are required to do so for life, making registration an unending version of parole or probation.

SORA's restrictions on residency, work, and loitering also resemble the ancient punishment of banishment. *See* Corey Rayburn Yung, *Banishment by a Thousand Laws: Residency Restrictions*

---

[4] *See also Snyder*, 834 F.3d at 703; *Hinman*, 530 P.3d at 1276 n.11; *Dep't of Pub. Safety*, 62 A.3d at 140; *Commonwealth v. Muniz*, 164 A.3d 1189, 1210–11 (Pa. 2017); *Starkey*, 305 P.3d at 1022–23; *Wallace*, 905 N.E.2d at 371; *Alaska*, 189 P.3d at 1012 ("Registration and disclosure provisions are comparable to conditions of supervised release and parole," internal quotation marks omitted).

*on Sex Offenders*, 85 W<small>ASH</small> U. L. R<small>EV</small>. 101 (2007). Registrants may not reside within five hundred feet of the property line of a school or daycare. I.C. § 18-8329(1)(d). They also cannot "loiter"[5] within five hundred feet from the property line of a school or daycare, or "loiter" within properties posted with a notice that they are used by a school or daycare, any time there are children present at the school or daycare for regular activities or within thirty minutes before or after such activities. I.C. § 18-8329(1)(b). Registrants cannot live with other registrants. I.C. § 18-8331(1). Registrants are also barred from applying for, or accepting employment at, any day care center, group day care facility, or family day care home. I.C. § 18-8327(1). And registrants must report any travel lasting more than 7 days, both to Idaho authorities and authorities in the jurisdiction to which they travel, even if such jurisdictions do not impose a registration requirement. I.C. § 18-8309(2).

Even if restrictions do not "explicitly exile" a registrant from the community, they may "effectively banish[]," as they prohibit registrants from many areas of a community. *Betts*, 968 N.W.2d at 508. While neither the Supreme Court nor the Ninth Circuit has considered whether such restrictions resemble banishment, other courts have so held—including the Sixth Circuit, which the Ninth Circuit cited with approval as helping explain this issue. *Wasden*, 982 F.3d at 792; *Snyder*, 834 F.3d at 702; *Baker*, 295 S.W.3d at 444; *Betts*, 968 N.W.2d at 508–09; *Starkey*, 305 P.3d at 1025–26; *Doe v. New Hampshire*, 111 A.3d at 1095; *Wallace*, 905 N.E.2d at 380.

SORA also resembles traditional shaming punishments. In *Smith*, the majority rejected shaming analogies, reasoning that Alaska's registry was "more analogous to a visit to an official archive of criminal records than it is to a scheme forcing an offender to appear in public with some

---

[5] SORA provides no definition of what it means to "loiter." The Idaho Supreme Court has found a similar criminal prohibition on "loitering" to be unconstitutionally vague and unenforceable. *State v. Bitt*, 118 Idaho 584, 588–90 (Idaho 1990).

14

visible badge of past criminality." *Smith*, 538 U.S. at 99.[6] But that analysis no longer holds: technology has dramatically changed the form, function, and reach of registry information in the nearly two decades since *Smith*—a time when only 15% of Americans had home internet. SMF 52. The Idaho registry allows active tracking and mapping of registrants using internet technology that did not exist when *Smith* was decided and pushes registrant information on internet users who are not even looking for it. SMF 53–60. Courts can and should account for evolving technology in considering constitutional claims. *See Carpenter v. United States*, 585 U.S. 296, 311 (2018); *Riley v. California*, 573 U.S. 373, 385 (2014); *Kyllo v. United States*, 533 U.S. 27, 35–36 (2001).

### C. SORA Serves the Traditional Aims of Punishment.

SORA promotes each of the traditional aims of punishment: incapacitation, retribution, and deterrence. *See Graham v. Florida*, 560 U.S. 48, 71 (2010); *Snyder*, 834 F.3d at 704.

Because SORA constrains former offenders solely based on their prior offenses and without individualized determinations, the State could not have considered the risk of recidivism the registrants posed individually. Imposing disabilities based on past offense, and not present dangerousness, is consistent with retributive theories of punishment. When a restriction is "imposed equally upon all offenders, with no consideration given to how dangerous any particular registrant may be to public safety, that restriction begins to look far more like retribution for past offenses than regulation intended to prevent future ones." *Baker*, 295 S.W.3d at 44;[7] *compare* SMF 50–51

---

[6] Based in part on this analysis in *Smith*, this Court rejected the argument that SORA constituted shaming in its order denying Defendants' motion to dismiss. Dkt. 90, at 36 n.27. Plaintiffs contend the basis of that decision in *Smith* no longer applies, but regardless, reassert the argument here to preserve it.

[7] *See also Betts*, 968 N.W.2d at 512 ("SORA was imposed on offenders for the sole fact of their prior offenses and made no individualized determination of the dangerousness of each registrant, indicating that SORA's restrictions were retribution for past offenses rather than regulations to prevent future offenses"); *Starkey*, 305 P.3d at 1027–28 (extending registration period without individual assessment of risk is retributive); *Letalien*, 985 A.2d at 22 (registry is punitive because it

(detailing widely used and available individual analysis for classifying risk of sex offenders). "The fact that the Act uses past crimes as the touchstone, probably sweeping in a significant number of people who pose no real threat to the community, serves to feed suspicion that something more than regulation of safety is going on; when a legislature uses prior convictions to impose burdens that outpace the law's stated civil aims, there is room for serious argument that the ulterior purpose is to revisit past crimes, not prevent future ones." *Smith*, 538 U.S. at 109 (Souter, J., concurring in the judgment).

Meanwhile, the statute's purported regulatory purpose—is itself also a traditional aim of punishment—seeking to prevent or reduce recidivism through incapacitation and specific deterrence. SORA seeks to incapacitate sex offenders from committing certain sex crimes (by barring them from places where they might have access to children) and to specifically deter them by making it more likely that they will be caught if they commit crimes. Because the same interests can be simultaneously described as punitive and regulatory, the fact that the restrictions advance them may not be very helpful in disentangling whether the restrictions should count as punishment for the purpose of the *Ex Post Facto* Clause. In *Smith*, the Court acknowledged that the statute could serve the traditional punishment purpose of general deterrence, but found that this factor was not dispositive, given its holdings on the other *Mendoza-Martinez* factors. 538 U.S. at 102. Here, however, those other factors tilt in favor of a finding of punitiveness.

---

applies exclusively to crimes, is not based on risk, and cannot be waived even if registrant is low risk); *Alaska*, 189 P.3d at 1014 (when law "determines who must register based not on a particularized determination of the risk the person poses to society but rather on the [conviction]," it creates a "retributive effect that goes beyond any non-punitive purpose and that essentially serves the traditional goals of punishment").

**D.  SORA Is Irrationally Related to its Purported Non-Punitive Purpose.**

SORA's "rational connection to a nonpunitive purpose" is the "most significant factor" in assessing whether the statute is punitive because, without a relationship to nonpunitive purpose, punishment becomes the only rational explanation. *Smith*, 538 U.S. at 102 (cleaned up).

SORA is not rationally related to its purpose of protecting against future sex crimes by convicted sex offenders, I.C. § 18-8302, because, in the decades since the Supreme Court decided *Smith*, the scientific evidence is nearly unanimous that notification laws do not reduce recidivism. SMF 20–22. In both multi-state and single-state studies—using different empirical research tools and data sources and examining different measures of recidivism—researchers from different disciplines, working independently, have failed to detect that public sex offender registries reduce recidivism. SMF 21.[8]

In fact, current empirical science suggests (perhaps counterintuitively) that SORA not only fails to promote public safety but actually undermines it by *increasing* recidivism of registrants. SMF 23–28. That is in part because SORA exacerbates risk factors (e.g. unemployment, unstable housing) that are known to contribute to reoffending. SMF 23, 26–28. Further, the isolating and incapacitating aspects of SORA reduce the value of any threat to return potential recidivists to prison should they commit additional sex crimes. SMF 29. "Put another way, the more difficult, lonely, and unstable registrants' lives are, the more likely they are to return to crime—and less they have to lose even if they are caught committing new crimes." SMF 29.

SORA is not rationally related to its non-punitive purposes because it fails to distinguish between the large percentage of people who present a lower risk of re-offending (especially over

---

[8] This finding operates independently of whether baseline recidivism rates for sexual offenders are high or low. SMF 22. Public sex offender registration laws and the disabilities they impose do not reduce the risk that someone will sexually reoffend, whether that risk is high or low. *Id*.

time) and the much smaller percentage of people who present a higher risk of re-offending (although that risk also decreases over time). SMF 30–51. Recidivism risk is not uniform across people with sex offenses; rather, risk varies based on well-known individual risk factors. SMF 32.

Recidivism risk drops significantly the longer a person lives in the community without recidivating. The decline in recidivism risk for people who remain conviction-free in the community is one of the most well-established findings in criminology. SMF 30. After five years recidivism-free, 40% of people with a sexual conviction will present no more risk of recidivism than people with a non-sexual conviction. SMF 47. At ten years, this increases to almost three-quarters (74.3%). *Id*. After 15 years, 96% will have no more risk of sexual recidivism than people with a past non-sex offense conviction (who are not subject to registration) will have of being convicted of a first sexual offense. Using the more stringent criteria of the general male population (as opposed to people convicted of non-sexual offenses), most (57.1%) sexual offenders will present no greater risk of recidivism after ten years recidivism-free; after 20 years, *all* sexual offenders present no greater risk than the general male population. SMF 46. Yet SORA includes more than 600 registrants whose convictions are more than 30 years old. SMF 16.

The risk of sexual recidivism is highly correlated with age. SMF 49. Recidivism rates are highest for people in their late teens and early 20s, with progressive declines thereafter such that very few people over the age of 60 present any significant risk for sexual recidivism. *Id*. Yet SORA includes more than 1,600 people who are 60 years old or older. SMF 14.

Because risk decreases over time in the community, lifetime registration is especially irrationally related to the State's non-punitive purposes and, in fact, serves no public protection function. SMF 37–38. Requiring registration of such a large group of offenders who pose a very low risk of reoffending serves no public protection function. This is especially true given that

18

empirically validated actuarial risk assessment instruments are both widely used, including by the Idaho Sex Offender Management Board, and far better than using the offense of conviction to predict recidivism risk. SMF 49–50.

The science—and the fact that researchers know much more about registries now than when the early cases were decided—matters. The Supreme Court has long recognized that "the constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist." *United States v. Carolene Prods. Co.,* 304 U.S. 144, 153 (1938). Courts around the country have increasingly recognized the scientific and academic consensus that registries do not work in finding an absence of a rational relation to a non-punitive purpose.[9]

### E.  SORA Is Excessive in Relation to Non-Punitive Interests.

SORA restrictions are excessive with respect to their regulatory purpose, in ways that differ from the Alaska statute at issue in *Smith*. This brief detailed above the ways in which Idaho's legislative scheme is particularly harsh, including its restrictions on movement, residency, and work, the fees it imposes, and its many reporting requirements, all lacking an individualized assessment. SORA's "negative effects are plain on the law's face … [and its] punitive effects ... far exceed even a generous assessment of [its] salutary effects." *Snyder*, 834 F.3d at 705. Imposing

---

[9] See, e.g., *Ortiz v. Breslin*, 142 S. Ct. 914, 916 (2022) (Sotomayor, J., re. denial of certiorari) (citing research that registry restrictions "may actually increase the risk of reoffending"); *Snyder*, 834 F.3d at 704 (questioning SORA's rationality based on evidence that registration "has, at best, no impact on recidivism"); *Hinman*, 530 P.3d at 1278 ("a growing body of research into the effectiveness of sex offender registries has cast significant doubt on their capacity to prevent recidivism"); *Betts*, 968 N.W.2d at 514 ("growing body of research" questioning efficacy); *Cornelio v. Connecticut*, 32 F.4th 160, 173 & n.7 (2d Cir. 2022) (collecting cases); *Hoffman v. Vill. of Pleasant Prairie*, 249 F.Supp.3d 951, 960–62 (E.D. Wis. 2017); *Doe v. Rausch*, 461 F.Supp.3d 747, 767 (E.D. Tenn. 2020); *Reid v Lee*, 476 F.Supp.3d 684, 708 (M.D. Tenn. 2020); *In re T.B.*, 489 P.3d 752, 768 (Colo. 2021).

19

these extensive burdens retroactively on thousands of people, many of whom have lived success-fully in the community for decades, is excessive.

Weighing the *Mendoza-Martinez* factors, courts around the country—e.g., in Alaska, Indiana, Maine, Maryland, Michigan, Montana, New Hampshire, Ohio, Oklahoma, and Pennsylvania—have recognized that registration is punitive, citing the lack of individual review, the oner-ousness of ongoing reporting, the length of the registration terms, and the extraordinary harm of being stigmatized as a sex offender.[10]

This Court should do the same.

### Conclusion

For all the above reasons, the Court should grant Plaintiffs' Motion for Summary Judgment on their *Ex Post Facto* claim. Plaintiffs suggest the nature and scope of the remedy should await further briefing and proceedings.

Date:   June 5, 2025            /s/ Matthew Strugar_____
                               Matthew Strugar (*pro hac vice*)

---

[10] *See, e.g., Hinman*, 530 P.3d at 1276 (registration is a "probationary surveillance system in per-petuity which is designed to facilitate social ostracism"; it "defies common sense" not to recognize it as punishment); *Snyder*, 834 F.3d at 705 (law's "punitive effects ... far exceed even a generous assessment of [its] salutary effects"); *Letalien*, 985 A.2d at 26 (retroactive lifetime registration and in-person reporting without opportunity for removal is punitive); *Starkey*, 305 P.3d at 1029 (ex-tending registration terms without individual review violates *Ex Post Facto* clause); *State v. Wil-liams*, 952 N.E.2d 1108, 1113 (Ohio 2011) (punitive to register for long periods absent finding of dangerousness); *Wallace*, 905 N.E.2d at 384 (registration without regard to risk violates *Ex Post Facto* clause); *Alaska*, 189 P.3d at 1017, 1019 (punitive because of extensive burdens without distinctions based on risk or opportunity for removal); *Doe v. New Hampshire*, 111 A.3d at 1101 (registration could be retroactively applied only after a hearing and periodic review to assess if the person posed a risk); *Dep't of Pub. Safety*, 62 A.3d at 143; *Rausch*, 382 F.Supp.3d at 798 ("stated legislative purposes appear to be supported by popular stereotypes, rather than any individualized assessment of dangerousness"); *Muniz*, 164 A.3d at 1218–19; *Pollard*, 908 N.E.2d at 1153 (statute exceeds non-punitive purpose because it restricts residency "without considering whether particu-lar offender is a danger").