Matthew Strugar (*pro hac vice*)
LAW OFFICE OF MATTHEW STRUGAR
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90010
T: (323) 696-2299
matthew@matthewstrugar.com

David B. Rankin (*pro hac vice*)
BELDOCK LEVINE & HOFFMAN, LLP
99 Park Avenue, PH/26th Floor
New York, New York 10016
T: (212) 277-5825
drankin@blhny.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JANE DOE #36, JOHN DOE #64, JOHN DOE #115, and JOHN DOE #117,<br><br>　　　　　　　　　Plaintiffs,<br><br>　　v.<br><br>RAÚL LABRADOR, Attorney General of the State of Idaho; and COLONEL BILL GARDINER, Director of the Idaho State Police, in their official capacities,<br><br>　　　　　　　　　Defendants. | Case No. 1:16-cv-429-DCN<br><br>**PLAINTIFFS' STATEMENT OF MATERIAL FACT NOT IN DISPUTE IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT** |

Plaintiffs Jane Doe #36, John Doe #64, John Doe #115, and Joe Does #117 provide the following Statement of Material Fact in support of their Motion for Partial Summary Judgment.

1. Jane Doe #36 is 62 years old. In 2004 she pleaded guilty to the crime of Lewd Conduct with a Minor Child Under the Age of Sixteen Years. She has no other registrable convictions. (Doe #36 Decl. ¶¶ 1–7.)

2. When Jane Doe #36 pleaded guilty in 2004, Idaho had a public registry with a default life duration, but the law as it existed at the time provided a mechanism for her to petition for release from registration. (I.C. §§ 18-8307(7) (2004); 18-8310(1) (2004).)

3. John Doe #64 is 75 years old. In 1998, he pleaded guilty in Oklahoma to Lewd Acts to a Child. He moved to Idaho in 2000. He has no other registrable convictions. (Doe #64 Decl. ¶¶ 1–10.)

4. When John Doe # 64 pleaded guilty in 1988, he was not subject to any registry because Oklahoma's registry, enacted in 1989, did not operate retroactively. 57 Okl. Stat. § 57-582. He was only made to register when he moved to Idaho in 2000, long after he completed his sentence. (Doe #64 Decl. ¶ 9.)

5. John Doe #115 is 48 years old. In 1995, when he was 18, he pleaded guilty to Assault with Intent to Commit a Serious Felony. He was informed he would have to register as a sex offender for 10 years. He has no other registrable convictions. (Doe #115 Decl. ¶¶ 1–10.)

6. When John Doe # 115 pleaded guilty in 1995, Idaho only required him to register in a nonpublic law enforcement database for ten years. (I.C. § 18-8305 (1995.)

7. John Doe #117 is 60 years old. In 2002, he pleaded guilty to the crime of Lewd Conduct with a Minor Child Under the Age of Sixteen Years. He has no other registrable convictions. (Doe #117 Decl. ¶¶ 1–7.)

8. When Jane Doe #117 pleaded guilty in 2002, Idaho had a public registry with a default life duration, but the law as it existed at the time provided a mechanism for him to petition for release from registration. (I.C. §§ 18-8307(7) (2004); 18-8310(1) (2004).)

9. All Plaintiffs completed their criminal sentences and sex offender treatment programs. (Doe #36 Decl. ¶ 5; Doe #64 Decl. ¶ 6; Doe #115 Decl. ¶ 6; Doe #117 Decl. ¶ 5.)

10. The Idaho sex offender registry consists of about 5,200 registrants. (Defendants' Responses to Plaintiffs' First Set of Requests for Admission ("RFAs"), No. 1; Strugar Decl. Ex. G)

11. The registry includes 12 people who are 90 years old or older. (RFAs No. 2.)

12. The registry includes 126 people who are 80 years old or older. (RFAs No. 3.)

13. The registry includes 605 people who are 70 years old or older. (RFAs No. 4.)

14. The registry includes 1,605 people (consisting of about 31% of the total registry) who are 60 years old or older. (RFAs No. 5.)

15. The registry includes 2,794 people (consisting of about 54% of the total registry) who are 50 years old or older. (RFAs No. 6.)

16. The registry includes 613 people (consisting of about 12% of the registry) whose only registrable conviction or convictions were prior to July 1, 1993, the date of enactment of Idaho's first sex offender registration law. (RFAs No. 7.)

17. The registry includes people who were convicted of their only registerable offense or offenses 50 or more years ago. (RFAs No. 8.)

18. SORA's avowed purpose is to empower law enforcement and the public in protecting against sexual offense recidivism by convicted sex offenders. (I.C. § 18-8302.)

19. SORA is premised on the proposition that registration will reduce recidivism by people with past convictions and thereby reduce the risk of sexual crime to the public. It does not. A near

unanimous scholarly consensus shows that online registries do not reduce the frequency of sexual recidivism—and may well increase it. (Prescott Rept., Strugar Decl. Ex. C, ¶¶ 1–7, 11–19.)

20. Dozens of studies on sex offender registration have failed to uncover any evidence that online registries reduce recidivism. Rather, the research shows that, at best, such registration laws make no difference and may well be counterproductive to their avowed public protection purpose. (*Id.*, ¶¶ 1–38.)

21. In both multi-state and single-state studies—using different empirical research tool and data sources and examining different measure of recidivism—researchers from different disciplines, working independently, have failed to detect that public sex offender registries reduce recidivism. (*Id.*, ¶¶ 2, 17.)

22. This finding operates independently of whether baselines recidivism rates for sexual offenders are high or low. Public sex offender registration laws and the disabilities they import "do not reduce the risk that someone will sexually reoffend, whether that risk is high or low." (*Id.*, ¶ 4.)

23. In fact, current empirical science suggests (perhaps counterintuitively) that SORA not only fails to promote public safety but actually undermines it by *increasing* recidivism of registrants. These results reflect the fact that registration and its consequences exacerbate risk factors for recidivism, such as lack of housing and employment; prevent healthy reintegration into the community; and have negative impacts on registrants' mental health. The recidivism-increasing effects of online registries at the very least offset and may overwhelm whatever public safety benefits such laws might offer (if any). (*Id.*, ¶¶ 11–38.)

24. Applied to Idaho, the research suggests that SORA registration statute contributes to sex offense conviction rates in than would exists without SORA. Moreover, the continued growth in

the size of the online registry will likely result in even more additional sex offense convictions as more people are added to the registry. Put simply, existing evidence suggests that, far from reducing recidivism, SORA increases the total number of sex offenses each year in Idaho. (*Id.*, ¶¶ 13, 15.)

25. SORA, by focusing on identifying strangers who might pose a danger, misidentifies where offending occurs because the large majority of sex offenses occur within the context of an existing familial or other relationship. (*Id.*, ¶¶ 31–32.)

26. Not only do registration schemes like SORA fail to improve community safety, but they also undermine the ability of people with past sex offenses to successfully reintegrate into society. (*Id.*, ¶¶ 1, 34–51.)

27. There is a scholarly consensus that people listed on public sex offender registries have difficulty finding and keeping stable housing, employment, and form positive relationships—key components in reducing criminal recidivism and reintegrating to society. (*Id.*, ¶¶ 1, 19, 33–37.)

28. The many burdens registrants face help to explain why the research shows that online registries do not decrease recidivism, and if anything may increase it by exacerbating the core risk factors known to contribute to it. (*Id.*, ¶¶ 1, 30–38.)

29. Further, the isolating and incapacitating aspects of SORA "reduce the value of any threat to return potential recidivists to prison should they commit additional sex crimes." "Put another way, the more difficult, lonely, and unstable registrants' lives are, the more likely they are to return to crime—and less they have to lose even if they are caught committing new crimes." (*Id.*, ¶ 35.)

30. Recidivism risk drops significantly the longer a person lives in the community without recidivating. This is one of the most well-established findings in criminology. (Hanson Rept., Strugar Decl. Ex. D, ¶¶ 58, 65.)

31. For registrants, the decrease in recidivism risk is dramatic—roughly 50% every five years—so the longer they remain conviction-free, the less likely they are to recidivate. If their risk was 10% at the time of release, it would drop to 5% after five years, and to 2.5% after ten years. (*Id.*, ¶ 71.)

32. Recidivism risk is not uniform across all people with a sex offense conviction. Rather, risk varies based on well-known risk factors. (*Id.*, ¶¶ 3a, 15–17, 41, Table 1 (p. 59).)

33. The most widely used risk assessment instrument for sexual recidivism is the Static-99/Static-99R. It scores people using 10 primary factors and, based on the score, groups people into five risk levels. (*Id.*, ¶¶ 43, 45–53; Table 1 (p. 59).)

34. Factors considered in a Static-99R assessment include the nature of the sex-related offense(s) that led to the "index offense," demographics (age, relationship history), criminal sexual history (prior sexual offenses, any male victim, any unrelated victims, any stranger victims, any non-contact sexual offenses), and general criminal history (prior sentencing dates, non-sexual violence committed along with the index offense, prior non-sexual violence). (*Id.*, ¶ 42.)

35. The sexual recidivism rates for people scored at levels of the Static-99R assessment correspond to their risk of recidivism. For those in the Level I classification the risk for a subsequent sexual offense is no different than the rate of a first-time sex offense conviction for people with a criminal history but no previous conviction for a sexual offense; it is so low that it would be practically impossible to lower it further. Those in Level II have a risk for sexual recidivism is slightly higher than the general population, but still very low (1.6% to 2.2% after five years). Those in Level III have between a 3% and 7% recidivism rate. Those in the top two levels, Level IVa (above average risk) and IVb (well above average risk), are expected to have sexual recidivism rates of between 9% and 60% after five years. (*Id.*, ¶¶ 50–53, 56.)

5

36. At the time of release, nearly three quarters of registrants will be classified as Level III-average risk or lower. Specifically, the distribution is as follows: Level I – 5.7%; Level II – 18.2%; Level III – 50.4%; Level IVa – 18.1% and Level IVb – 7.6%. (*Id.*, ¶ 54.)

37. Recidivism risk decreases dramatically over time. **After 10 to 15 years in the community without recidivating, the great majority of sexual offenders are at or below the base-line risk for non-sexual offenders and will be so low that any further interventions have no public protection benefits**. (*Id.*, ¶ 56.)

38. Because risk decreases over time in the community, lifetime registration terms serve no public protection function. (*Id.*, ¶¶ 3.6, 27, 67–87.)

39. The point at which registrants (people with sex offense convictions) are no more likely to be convicted of a new sex offense than non-registrants (people without sex offense convictions) is called "desistance." Once a registrant reaches desistance, that person is no more likely, or even less likely, than a non-registrant to be convicted for a new sex offense. (*Id.*, ¶¶ 75–76.)

40. There are two logical comparison groups for measuring desistance: (1) people convicted of non-sexual crimes; and (2) the general population of adult males with no criminal sexual history. Neither group is placed on sex offender registries. (*Id.*, ¶¶ 19, 85.)

41. Studies show that the rate of first-time out-of-the-blue sex offense convictions by men with criminal convictions for non-sex offenses (but no convictions for sex offenses) is equivalent to a 5-year sexual recidivism rate of 2%, and an estimated lifetime rate of 3.8%, while the same rates for males in the general population is 1% and 2%. (*Id.*, ¶¶ 20, 23.)

42. Some registrants—those classified as Level I—are, from the outset, no more likely to be convicted of a new sex offense than these non-registrants. (*Id.*, ¶¶ 3.g, 74, 77–80.)

43. Other registrants (who are not convicted for a new sex offense) will over time also reach

desistance and be no more likely to recidivate sexually than a non-registrant with a non-sexual offense history is to commit an out-of-the-blue sex offense. Even the highest risk registrants will eventually reach desistance if they remain sex-conviction-free in the community over time. (*Id*., ¶¶ 71–74, 76.)

44. How quickly registrants reach desistance depends on their risk level at the time of release. The lowest risk (Level I) start out below the desistance baseline—that is, they have already attained desistance on the day they are released. Those in Level II cross the threshold after about five years; Level III after about ten years; Level IVa after about 15 years; and even those in Level IVb (well-above average risk) reach desistance after about 20 years. All registrants eventually cross the desistance threshold if they remain in the community without recidivating, meaning that their risk is below the baseline risk presented by non-registrants. (*Id*., ¶¶ 3.g, 77–79.)

45. In other words, **the risk of being convicted of a new sex offense has, for practical purposes, been extinguished for most people who remain in the community without recidivating sexually after 10 years, and for all such registrants after 20 years**. This is true even for people classified at the highest risk level at the time of release. (*Id*., ¶¶ 77–81.)

46. Research on recidivism also includes time-survival analysis. For example, a person's life expectancy at birth might be 82, but if the person lives to 82, the person may then have a life expectancy of 91. Similarly, the risk of sexual recidivism decreases when people do not recidivate during earlier periods of relatively higher risk. **After ten years recidivism-free, most people (57.1%) with a sexual conviction will present no more risk than the general male population (2% lifetime). After 20 years recidivism-free, all will be classified as presenting no more risk than the general male population**. (*Id*., ¶¶ 3.g, 82–86.)

47. Using the less stringent criteria of the sexual conviction rate of people with a nonsexual

7

criminal conviction (3.8% lifetime)—as opposed to the general male population (2% lifetime)—13.6% of registrants are very low risk at the time of release. After five years almost 40% will be low risk, and ***this proportion increases to almost three-quarters (74.3%) after ten years. After 15 years, 96% will have no more risk of sexual recidivism than people with a past non-sex offense conviction (who are not subject to registration) will have of being convicted of a first sexual offense***. Again, after 20 years, all registrants who have remained recidivism-free will have no more risk than non-registrants who have a non-sex conviction. (*Id*., ¶¶ 85–86.)

48. Because recidivism risk declines significantly with time spent recidivism-free in the community (as well as with advancing age), requiring registration after registrants have attained desistance serves no public safety purpose. (*Id*., ¶¶ 3, 27, 67–87, 91.)

49. The risk of sexual recidivism is highly correlated with age. Recidivism rates are highest for people in their late teens and early 20s, with progressive declines thereafter such that very few people over the age of 60 present any significant risk for sexual recidivism. (*Id*. ¶¶ 3.c, 27.)

50. Empirically validated actuarial risk assessment instruments—which use known diagnostic indicators to determine the statistical likelihood that people will recidivate—are both widely-used and far better than the offense of conviction at predicting recidivism risk. (*Id*., ¶¶ 39–43.)

51. The Static-99R, and its predecessor, the Static-99, are the most widely used and well-researched sex offense risk assessment instruments in the world and a required measure stipulated by the Idaho Sexual Offender Management Board. Based on the Static-99R scores, it is possible to identify when registrants pose no more risk of being arrested/convicted of a sex offense than (a) people who have never been convicted of a sex offense but have been convicted of some other crime, and (b) males in the general population. (*Id*., ¶¶ 39–87.)

52. While the U.S. Supreme Court described an early version of an online sex offender registry

as "analogous to a visit to an official archive of criminal records," *Smith v. Doe*, 538 U.S. 84, 99 (2003), the internet and registries themselves have dramatically changed the form, function, and reach of registry information. (Lageson Rept., Strugar Decl. Ex. E, ¶ 11 ("Lageson Rept.").)

53. The Idaho registry allows users to "browse" lists of registrants by county, city, or zip code—or even use an interactive map to show where registrants reside—rather than requiring (like most sources of public state criminal record data) a targeted name or address search. (Registry Screenshots, Strugar Decl. Exs. H–K.)

54. Each registrant's page allows the user to "track registrant," which allows the user to receive continuous notices about a registrant through an email signup and notification system, which is also not a function of public criminal record information. (Lageson Rept., ¶¶ 28–32).

55. When *Smith* was argued in 2002, the internet was quite different than it is today. Only 11% of Americans had broadband home internet and only 59% used it at all. Only 6% of Americans said they would have a hard time giving up their Blackberry or other wireless email device. Today, 95% of Americans use the internet, 90% have a smartphone, 80% have high-speed internet at home, and 40% report being online "almost constantly." (*Id*., ¶¶ 37–38.)

56. Today, a person's registry status has become digitally linked to their names and is retrievable via basic internet searches—indeed, it is often the first thing that will show up on a search of a person's name on Google. Search engine optimization has increased public access to registrants' personal information because search engine algorithms prioritize registry information. (*Id*., ¶¶ 21, 41–43.)

57. Registry information is now cataloged, indexed, sold, and shared by third parties. Such information is routinely scraped, copied, aggregated, and reposted to private websites. Mobile apps collect and aggregate registrant data into new formats that allow "push notifications" that

affirmatively alert users when they are in proximity to a registrant's address. (*Id*., ¶¶ 15–16, 54.)

58. When a person's registry status "pops up" on the internet, the consequences can be devastating, affecting employment, housing, education, and involvement in civic, religious, social, and family life. Easy access to registry information results in registrants becoming the targets of on- and off-line vigilantism. (*Id*., ¶¶ 61–76.)

59. The proliferation of information about registrants on the internet leads them to avoid online activity, which in today's world is central to public and private social life. Registrants' opting out through "digital avoidance" has consequences for public safety, as registrants are more likely to recidivate when they lack employment, stable housing, and community relationships. (*Id*., ¶¶ 57–71.)

60. The Idaho registry, by allowing the attendant dissemination of online registry information on private websites, undermines public safety by making registrants pariahs, effectively cutting them out of social, institutional, and technological life. (*Id*., ¶¶ 17–18, 61–71.)

61. Because of the severe consequences of registration, whether a conviction will result in registration is a key factor for people charged with sex-related crimes in deciding whether to plead guilty. (Loschii Rept., Strugar Decl. Ex. F, ¶¶ 5–11.)

62. Due to the difficult of winning sex offense cases and the severity of the consequences of registration, people accused of sex offenses often bargain to avoid convictions that require registration. (*Id*., ¶ 11.)

63. People accused of sex offenses who plead guilty to non-registrable offenses are still the same people, with the same risk (or lack of risk) of reoffending. (*Id*., ¶ 12.)

Date:   June 5, 2025               /s/ Matthew Strugar_____
                                    Matthew Strugar (*pro hac vice*)